UNITED STATES of America, Plaintiff,

v.

VERTAC CHEMICAL CORPORATION; and Hercules, Inc., a corporation, Defendants.

ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Plaintiff,

v.

VERTAC CHEMICAL CORPORATION; and Hercules, Inc., a corporation, Defendants.

Nos. LR–C–80–109, LR–C–80–110.

United States District Court, E. D. Arkansas, W. D.

May 12, 1980.

Ronnie Shorenstein Alkire, Dept. of Justice, Washington, D. C., Markham Lester, Asst. U. S. Atty., Little Rock, Ark., for United States of America.

Richard H. Mays and Paul N. Means, Jr., Little Rock, Ark., for State Dept. of Pollution Control and Ecology.

John P. Gill and David Allan Gates, Little Rock, Ark., for Vertac Chemical Corp.

Alston Jennings and Gus B. Walton, Jr., Little Rock, Ark., for Hercules, Inc.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

*The Pleadings.* The Arkansas Department of Pollution Control and Ecology and the United States of America on March 4, 1980 filed separate suits against the Vertac Chemical Corporation and Hercules, Inc., both Delaware corporations, in the United States District Court for the Eastern District of Arkansas. The complaint filed by the United States is pursuant to Section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, et seq., §§ 302(a), 402, 309(b) and (d) and 504 of the Clean Water Act, 33 U.S.C. §§ 1312(a), 1342, 1319(b) and (d) and 1364; Section 13 of the Refuse Act, 33 U.S.C. § 407. It seeks civil penalties and injunctive relief to abate a continuing discharge of toxic and hazardous wastes and pollutants into navigable waters, soil, atmosphere and ground water. The Arkansas Department of Pollution Control and Ecology is an agency of the State which is given statutory authority to compel compliance with the Arkansas Water and Air Pollution Control Act, Solid Waste Management Act, and Hazardous Waste Management Act, and to require the taking of such remedial measures as may be necessary or appropriate to implement or effectuate the provisions and purposes of said acts. Ark.Stat. Ann. §§ 5–908, 82–1909(b), 82–1935(n), 82–2707(j) and 84–4204(i). For the purposes of the request for preliminary injunctive relief, the allegations of the state's complaint and those of the United States are virtually the same and substantially the same relief is required.

The State in its original pleading asked for a preliminary injunction requiring the defendants to (a) cease the discharge of toxic chemicals into Rocky Branch Creek from the landfill areas on the site; (b) to cease the discharge of toxic chemicals into Rocky Branch Creek and into the air from the surface storage and spill areas; and (c) to cease the discharge of toxic chemicals into the groundwater, Rocky Branch Creek and the Jacksonville Sewage system from the existing equalization basin (also referred to as the oxidation pond during the course of the proceedings) by discontinuing active use of the equalization basin; draining and securely storing the liquids contained therein; removing and securely storing the contaminated sludges therein; and closing the site to prevent future run-off and percolation of toxic chemicals. On April 14, 1980 the United States filed a motion for a preliminary injunction requiring defendants to do the following:

1. Immediately cease the discharge of hazardous wastes to the equalization basin on defendant's property from the pipe from the central plant area.

2. Immediately cease the discharge of hazardous wastes from the pipe which runs from the equalization basin on defendants property to the Jacksonville sewage treatment plant.

3. Within 45 days drain the equalization basin and sump below it and store the drained material in containers which will not allow leakage of the materials. Place the containers in an area protected from the elements by a concrete pad on the floor, a roof, curbing and diking.

4. Close the drained equalization basin and sump areas in a manner acceptable to EPA which will ensure no further contamination of the Vertac site due to contact of the drained areas with surface water or the escape of wastes from the drained areas into the air.

5. Within 30 days rebarrel any drums of wastes, including those resulting from 2,4–D production, which are leaking or which appear to be susceptible to leakage. Put them in containers which can reasonably be expected to withstand corrosion from the wastes for five (5) years.

6. Store all drums of waste on site in the existing roofed and diked area or in an area offering equal or greater protection from the elements.

7. Take the following steps to minimize the release of toxic materials from the Vertac site:

a. Within 30 days cover the area north of the Hercules-Transavaal landfill area known as the "old barrel storage area", with a layer of clay which will prevent any infiltration by rainfall or other surface water.

b. Complete within 30 days actions to begin abatement of discharge from the Reasor-Hill landfill areas as set forth in the "Proposed Contaminated Water Containment System" prepared for Vertac Inc., by Shreeve Engineering, Ltd. on July 6, 1979.

c. Immediately begin sampling and analyses of the water in the eight existing groundwater monitoring wells in the Reasor-Hill burial area by experts acceptable to EPA who shall be directed to report their findings on the first day of every month to EPA.

d. Complete within 60 days the actions to begin abatement of the discharge from the Hercules-Transvaal landfill area as set forth in the "Proposed Contaminated Water Containment System" prepared for Vertac, Inc. by Shreeve Engineering, Ltd. on August 9, 1979.

e. Immediately begin sampling and analysis of the water in the three existing groundwater monitoring wells on the Hercules-Transvaal burial area by experts acceptable to EPA who shall be directed to report their findings on the first day of every month to EPA.

f. Install 3 additional wells to monitor the Hercules-Transvaal landfill area and adjacent old barrel storage area, at locations approved by EPA. Upon installation of the wells, begin sampling and analysis of the water in the wells by experts approved by EPA who shall be directed to report their findings to EPA on the first day of each month.

g. If the groundwater data collected in response to # 7b–f above reveals that contamination of the site with hazardous wastes is continuing, submit a plan to cure such contamination within 30 days after EPA has identified its area of concern and implement such plan upon receipt of EPA approval.

The cases were consolidated for trial, and a three-day hearing on the preliminary injunction was begun on April 28, 1980. All the parties were represented by able and knowledgeable counsel, and a mass of expert testimony was taken. Alleged pollution from the Vertac plant and its predecessors has been a matter of great public interest. It has been the subject of extensive press coverage both in Arkansas and in periodicals of national circulation.

*History and Background of the Controversy.* Defendant Vertac Chemical Corporation owns and operates a chemical manufacturing plant in Jacksonville, Arkansas. The plant is located on a 92.7 acre site bounded by a major thoroughfare named Marshall Road on the east, a small residential area on the south, and undeveloped land on the north and west. Rocky Branch Creek, a tributary of Bayou Meto, flows through the western portion of the plant site.

The plant site was originally developed by the United States government in the mid-1930's as a munitions factory. In 1948 a company named Reasor-Hill purchased the site and converted it to pesticide production. Initially, Reasor-Hill used the plant to formulate[1] finished insecticide products. The products consisted primarily of DDT, aldrin, dieldrin, and toxaphene. In the mid-1950's, Reasor-Hill modified the plant and began manufacturing phenoxy

1. The term "formulate" is used in the pesticide industry to describe the process of mixing active ingredients with other materials, such as powder, water, solvents, or emulsifiers, to produce a finished product that is ready for use. Formulators typically buy their active ingredients from a "manufacturer." The term "manufacture" is used in the pesticide industry to describe the production of the active ingredient itself.

herbicides, principally 2,4–D,[2] 2,4,5–T,[3] and 2,4,5–TP.[4]

In 1961 defendant Hercules purchased the plant from Reasor-Hill. When Hercules took possession of the plant from Reasor-Hill, a large number of deteriorating drums had been stacked in an open field immediately southwest of the operations area. The precise contents of these drums are not known, but the labels suggest that the material consisted of miscellaneous insecticide wastes (i. e., DDT, aldrin, dieldrin, etc.). Shortly after taking custody of the plant in 1961, Hercules buried these wastes by digging trenches with a bulldozer, pushing the barrels in, pushing the trenched dirt on top, and compacting by repeated passes in the bulldozer (hereafter "Reasor-Hill Landfill Area"). Hercules denies that it buried any of its own waste materials in the area. However, test results indicate the presence of dioxin in this area, and it is difficult to explain the presence of the dioxin in that area except by concluding that Hercules may have, prior to the development of the toluene removal process (discussed infra) in 1963, disposed of some 2,4,5–T waste in that area which contained dioxin. By the early spring of 1979, erosion had uncovered some of the drums and small areas of discolored leachate began to appear.

From 1961 until 1971 Hercules operated the plant to manufacture 2,4–D, 2,4,5–T, and 2,4,5–TP. In particular, Hercules produced large quantities of "Agent Orange," a half and half mixture of 2,4–D and 2,4,- 5–T that was used widely by the United States government to clear jungle undergrowth in Vietnam.

In 1971 Hercules leased the plant site to Transvaal, a predecessor of defendant Vertac. Transvaal operated the plant as Hercules' lessee from 1971 to 1976. In 1976 Transvaal was reorganized into Vertac, and Vertac purchased the plant from Hercules. From 1976 to the present, defendant Vertac has owned and operated the plant. Throughout the Transvaal and Vertac period, the plant has continued as a manufacturing facility for 2,4–D, 2,4,5–T, and 2,4,5–TP.

The manufacturing processes used by Reasor-Hill, Hercules and Vertac produced two basic waste streams that are of concern in this proceeding. First, the manufacturing process resulted in waste water that was acidic and contained phenols. In addition, when 2,4,5–T or 2,4,5–TP was being produced, the waste water also contained 2,3,7,8 tetrachlorodibenzo-p-dioxin (hereafter "dioxin").[5] Initially Reasor-Hill discharged this waste water directly onto the ground at the west end of the plant, from which it ran down a small hill and into Rocky Branch Creek. Hercules continued the untreated discharge for the first few years of its operation. The untreated discharge killed all of the bottom life in Rocky Branch Creek and Bayou Meto, and even killed the vegetation along the banks of both waterways.

2. The full name for 2,4–D is 2,4, dichlorophenoxyacetic acid, but customarily it is referred to by the shorthand designation "2,4–D."

3. The full name for 2,4,5–T is 2,4,5 trichlorophenoxyacetic acid, but customarily it is referred to by the shorthand designation, "2,4,5–T."

4. The full name for 2,4,5–TP is 2,4,5 trichloropropionic acid, but customarily it is referred to by the shorthand designation "2,4,5–TP" or by the trade name "Silvex."

5. The term "dioxin" refers to any chemical composed of a pair of benzene rings connected by two oxygen bonds. There are many distinct types of dioxin, and separate isomers of each type. 2,3,7,8 tetrachlorodibenzo-p-dioxin is a specific isomer of one type of dioxin. The various isomers and types of dioxin differ widely in the nature and degree of their toxicity. There is great doubt about the ability of chemical analysis to distinguish between the various isomers of dioxin. The chief analytical chemist for the State admitted that he simply assumed that all dioxin he reported was the 2,3,7,8 isomer of tetrachlorodibenzo-p-dioxin. EPA's witnesses claimed greater sophistication but no certainty in distinguishing isomers. However, for purposes of the proceedings on preliminary injunction, the Court assumes that all dioxin reported was the 2,3,7,8 isomer of tetrachlorodibenzo-p-dioxin. The Court bases this assumption on the fact that the defendant's witnesses agreed that 2,3,7,8 tetrachlorodibenzo-p-dioxin was a type and isomer of dioxin likely to be produced in the manufacturing process.

In cooperation with the Arkansas Pollution Control and Ecology Commission, Hercules constructed a waste water pretreatment system that was completed in July or August of 1964. The system consisted of a fishhook-shaped neutralization trench (designed to reduce the acidity of the water), a U-shaped equalization basin (designed to stabilize the rate of flow into the Jacksonville sewage system), a final or "polish" neutralization point, and a pump and pipe to deliver the treated waste water to the Jacksonville sewage system. From the completion of this system in July or August of 1964, there has been no deliberate discharge of waste water into Rocky Branch Creek. The testimony indicates that the aquatic life and vegetation along Bayou Meto has recovered to some extent since the installation of the equalization basin and related pretreatment facilities.

The second waste stream of concern in this proceeding is unique to the 2,4,5–T and 2,4,5–TP manufacturing process. An early step in this process involves the production of a precursor chemical, trichlorophenol. During the production of trichlorophenol an unavoidable side reaction takes place which produces small quantities of dioxin. During Reasor-Hill's operation of the plant, the dioxin remained in the trichlorophenol throughout the manufacturing process and ultimately became a contaminant of the finished product. Shortly after taking over the plant in 1961, Hercules instituted an extraction process by which most of the dioxin in the trichlorophenol was removed in toluene, and the toluene extract was distilled off, leaving a waste stillbottom containing virtually all of the dioxin that previously had found its way into the finished product. The waste stream of concern in this process is the toluene stillbottom, which concededly contained concentrations of dioxin in the 30–45 parts per million ("ppm") range.

These toluene stillbottoms were piped out of the process equipment while still hot into steel drums. When the material cooled in the drums, most of it hardened to the approximate consistency of a rubber ball. A small amount of the material remained semisolid, however, and therefore was capable of oozing. From the installation of the toluene extraction process until sometime in 1974, Hercules and Transvaal buried the toluene stillbottoms in landfill areas just north of the operations buildings (hereafter "Hercules-Transvaal Landfill Area"). Other wastes were also buried in the Hercules-Transvaal Landfill Area.

Starting in late 1974, Transvaal began storing the barrels of toluene stillbottoms above ground in hopes that the material could be recycled. Vertac continued this practice. Over time, some of the barrels corroded, allowing some of the semi-solid portions of the waste to leak onto the ground. To contain potentially contaminated storm water runoff, Vertac constructed dirt dikes around the area (hereafter "Above Ground Barrel Storage Area").

On February 28, 1979, EPA suspended many of the uses of 2,4,5–T. 44 Fed.Reg. 15874 (published March 15, 1979). In March of 1979 Vertac voluntarily suspended production of 2,4,5–T. Since that date Vertac has produced no 2,4,5–T or 2,4,5–TP; and therefore, there have been no new dioxin contaminated stillbottoms produced.

In late spring of 1979, Vertac, Hercules, EPA, and the Arkansas Department of Pollution Control and Ecology ("ADPC&E") entered into negotiations regarding the conditions at the plant, particularly with respect to the landfilled wastes and the deteriorating barrels stored above ground. As a result of these negotiations, Vertac, Hercules, EPA, and ADPC&E entered into an agreement in which ADPC&E entered an administrative order directing that certain actions be taken by Vertac.

The ADPC&E order called for action in several basic areas: (1) recontainerization of all leaking barrels in the above ground storage area; (2) construction of a roofed facility with a sealed, diked concrete floor; (3) removal of all barrels in the Above Ground Storage Area to the new building; (4) levelling of all dikes and containerization of all contaminated soil and storm water in the Above Ground Barrel Storage

Area; (5) placement of a clay cap, topsoil, and grass over the Reasor-Hill landfill; (6) submission of plans for a groundwater monitoring program and for a new waste water pretreatment system to replace the equalization basin; and (7) an extensive program of sampling and analysis.

It is clear that Vertac has substantially complied with the June 15, 1979 ADPC&E order and has cooperated with ADPC&E. The evidence indicates that full compliance with the order has to some extent been delayed by lack of final approval by the ADPC&E, EPA, or both.

The evidence is undisputed that: (1) Vertac built the new roofed storage facility called for by the Order: (2) Vertac recontainerized all of the leaking barrels stored above ground; (3) Vertac removed all of the barrels to the new building; (4) Vertac levelled the dikes and containerized all contaminated soil and storm water in the Above Ground Storage Area; (5) Vertac placed a clay cap on the Reasor-Hill landfill area; and (6) Vertac supplied all sampling and submitted all engineering plans called for by the Order. It is also undisputed that Vertac spent over $450,000 in direct expenses on efforts called for by the June 15, 1979 order, and that it ceased all production from June 15 to September 22, 1979, and devoted all of its suitable manpower to the compliance effort. The cessation of production and the direct expenditures in the compliance effort resulted in a loss to Vertac of $1,000,000 for 1979 based on gross sales of $8,000,000.

Although the efforts of Vertac thus far have been extensive, it is clear that dioxin is present in the parts per billion (ppb) level in soil and sediment on the plant site and in the low parts per trillion range at isolated points off site. The significance of these levels of dioxin depend upon two factors, the toxicity of such small concentrations of dioxin and the likelihood that there will be human or environmental exposure.

It is undisputed that dioxin is the most acutely toxic substance yet synthesized by man. The acute toxicity of dioxin is not directly relevant to this proceeding, how-ever, because the concentrations on and off the plant site are far below the threshold for acute or single-dose toxic effects. The chronic toxicity of dioxin (i. e., the effects of repeated, low-level exposure over a long period of time) is the real focus of this proceeding. The chronic toxicity of dioxin has been the subject of lengthy scientific debate, and the expert testimony in this proceeding reflects the nature of that debate. There is evidence that dioxin has produced mutagenic, teratogenic, fetotoxic, and possibly carcinogenic results in low-dose levels in various laboratory animals and cell culture tests. The EPA and ADPC&E experts testified that in their opinion no level of dioxin exposure, other than zero, had been proven to be safe. There is also evidence, however, below which chronic toxic effects are not observed. A tolerance of .001 ppm dioxin content in 2,4,5–T products has been permitted. A 1979 EPA Science Advisory Panel Report states that it believes a dose of 0.001 ug/kg per day of dioxin is for all practical purposes a No Observable Effects Level (NOEL) for toxic effects. 44 Fed. Reg. at 72337 (Dec. 13, 1979). There is, however, sufficient evidence to warrant caution in this proceeding with respect to any concentration that threatens exposure equal to or in excess of the EPA Science Advisory Panel NOEL of 0.001 ug/kg.

The second factor in determining the significance of the levels of dioxin reported is the likelihood of human or environmental exposure. The highest sample readings were found, not surprisingly, in the toluene stillbottoms. These readings are high, but they pose no present threat to health or the environment because the parties all agree that storage of the stillbottoms in the new roofed facility provides adequate interim protection against human or environmental exposure until suitable permanent disposal is decided upon.

The next highest readings, in the parts per billion range, came from the Above Ground Barrel Storage Area. There is disagreement over the representativeness of some of these samples because many read-

ings reflect conditions prior to the 1979 cleanup. In particular, the high samples were of obvious barrel leakage that has since been removed and containerized. There is also disagreement about the likelihood of any human or environmental exposure because the area is posted and secured against unauthorized entry even by Vertac employees. There is agreement, however, that normal caution warrants placement of a clay cap, topsoil, and grass over the area. Vertac previously agreed to do this capping, but had been asked to postpone action pending further testing by the EPA and ADPC&E. The government parties are now ready for Vertac to proceed, and it has reaffirmed to this Court its willingness to do so.

The next highest readings of dioxin are found in samples of sludge waste and sediment from the equalization basin. As with the Above Ground Barrel Storage Area, the parties dispute the significance or representativeness of the readings, but agree that caution justifies preventive action. Vertac previously submitted for EPA and ADPC&E approval plans for a new pretreatment system that would replace the existing equalization basin and related facilities. The government parties have not approved or disapproved the proposal submitted by Vertac, but there have been discussions of installing a different system, involving an alternative vessel. In argument before this Court, the government parties indicated that they desired Vertac to proceed with the development plans for an alternative vessel,[6] and Vertac indicated its willingness to do so. Vertac indicated that it would take 45 days to have a formal engineering design and probably an additional 4 to 5 months after governmental approval to execute the plan. The government parties, while desiring the greatest possible dispatch, voiced no objection to such a schedule.

The levels of dioxin reflected in the samples fall off sharply after one looks beyond the barreled wastes, the Above Ground Barrel Storage Area, and the equalization basin. The next highest readings are found in the Hercules-Transvaal Landfill Area and an area near the trichlorophenol reactor that has been referred to as the "Blowout Area." This latter area is one onto which some of the materials from the trichlorophenol reactor were expelled during rupture valve blowouts experienced by Hercules and Transvaal prior to 1976. In 1976 Vertac installed a catch basin into which the expelled contents of the vessels would be discharged during any blowout, which, the parties agree, has operated satisfactorily. With respect to the Hercules-Transvaal Landfill Area and the Blowout Area, the parties again dispute the significance of the levels of dioxin reported but agree that caution warrants the placement of a clay cap, topsoil, and grass. Execution of such plans has been delayed pending completion of government bore samples. The matter is further complicated by the task of assigning appropriate responsibility between Hercules and Vertac. Although Vertac and Hercules seem clearly willing and able to divide the task as a voluntary undertaking by agreement among themselves, a suitable compulsory order would be difficult to fashion at this time. It would be unreasonable to compel Vertac to bear the expense for which Hercules was partly or wholly the cause, and it would be unusual, at the very least, to compel one party to enter the lands of a second party to undertake work desired by yet a third party.

The final area of present concern on the plant site is the Reasor-Hill Landfill Area. Vertac has already placed a clay cap on this area with Hercules' financial assistance. Topsoil and grass were not approved by

**6.** EPA originally sought an immediate prohibition of any discharges to or from the equalization basin. It is undisputed that the plant cannot operate without discharging waste water into the present equalization basin or some alternative. Any prohibition of discharges before the installation of an alternate system would force a shut down of the plant. Since EPA indicated in argument that it had no desire to shut the plant, the Court assumes EPA abandoned its request for immediate prohibition of all discharges. To the extent EPA has not abandoned that request, the Court deems it unwarranted and denies the relief in question.

ADPC&E or EPA until too late in the year to start the work. Some erosion of the cap has resulted. The parties agree that repair of the erosion and placement of topsoil and grass is desirable. In addition, installation of clay intercept walls at the north and east boundaries of the Reasor-Hill Landfill Area has now been approved by EPA and ADPC&E and is viewed as desirable by Hercules and Vertac.

The final area of concern on site in this proceeding involves the placement of monitoring wells. Several wells have already been dug and some samples reported. EPA and ADPC&E desire additional wells and samples. However, ADPC&E has taken the position that these additional wells are not necessary so far as the relief sought by the preliminary injunction is concerned.

The evidence regarding dioxin levels off the plant site contrasts sharply with the evidence regarding samples taken on site. The evidence indicates that there is no dioxin in the water in Rocky Branch Creek, Bayou Meto, or the effluent from the Jacksonville sewage treatment plant. There is evidence that dioxin is present in the low parts per trillion ("ppt") level in sediment in Rocky Branch Creek and Bayou Meto, and in sludge in the Jacksonville sewage treatment plant. This evidence is consistent with the expert testimony that dioxin is highly insoluble in water and binds tightly to clay. There is also evidence that some fish and other aquatic life in Bayou Meto have bioaccumulated dioxin to levels up to 600 parts per trillion.

The parties vigorously dispute the significance of the dioxin levels observed off site, as well as the issue of where the dioxin originated. The government parties presented expert witnesses who theorized about means by which the dioxin found off site could have been transported from the Vertac site, namely by storm water run off, airborne dust particles, and volatilization. The main thrust of this testimony was to suggest that all dioxin presently found on the Vertac plant site was likely to escape into the environment rapidly if action was not taken immediately.

## FINDINGS OF FACT

1. The location at issue in this case ("Vertac site") is an approximately 92-acre site located in Jacksonville, Arkansas. On the site is a plant which has been used for the manufacture of chemicals since approximately 1946.

2. Prior to 1946, the Vertac site was used as a munitions factory by the United States Government. In 1946, Reasor-Hill Corporation acquired the Vertac site. Reasor-Hill manufactured and formulated various pesticides and herbicides, and in approximately 1956 began to manufacture 2,4,5–T.

3. In late 1961, Hercules, Incorporated ("Hercules") acquired the Vertac site and remained in possession of it until October 1, 1971. Hercules manufactured herbicides including 2,4–D and 2,4,5–T, but did not manufacture or formulate insecticides.

4. As of October 1, 1971, Hercules leased the Vertac site to Transvaal, Incorporated ("Transvaal") and certain individuals under an agreement marked as Defendant Hercules' Exhibit No. 1. This lease provided in part:

16. This Lease is made on the express condition that the leased premises shall be used only for maintaining and operating a plant and facilities for the manufacture of phenoxy herbicides and in full accordance with all applicable laws or regulations concerning the operation of the plant, including the disposal of wastes therefrom, and the sale, delivery and use of products made therein. . . .

5. Hercules has not been in possession or control of the Vertac site since October 1, 1971.

6. Transvaal, through a series of corporate reorganizations, has become defendant Vertac Chemical Corporation ("Vertac"), and, pursuant to stipulation, Vertac and Transvaal are considered the same corporation.

7. On October 1, 1976, Transvaal purchased the Vertac site from Hercules, and Vertac, Transvaal's successor, is the present titleholder.

8. Vertac (or Transvaal) has had control of and operated all facilities at the Vertac site from October 1, 1971, to the present, and has manufactured and formulated herbicides, including 2,4–D and 2,4,5–T.

9. Dioxin is formed during an intermediate stage in the manufacture of 2,4,5–T. It is a highly toxic chemical which, given sufficient dosage and sufficient exposure, causes various health problems in laboratory animals and in human beings. In fact, Dioxin is the most toxic man-made molecule known.

10. Dioxin is persistent in the environment.

11. Dioxin bioaccumlates in the tissues of plants and animals.

12. Dioxin has low solubility in water, but an affinity for soil and lipids.

13. Dioxin is volatile in air in the presence of particulate matter.

14. Dioxin has been shown to be carcinogenic, teratogenic, fetotoxic and mutagenic in animals in concentrations in the parts per trillion (ppt) range. It is suspected but not proven to be a carcinogen and teratogen in humans.

15. There is presently no known safe detectable level of dioxin in the environment, using currently available, methods of detection, but a 1979 EPA Science Advisory Panel Report states that there are no observable effects (NOEL) with 0.001 micrograms per kilogram of body weight.

16. Samples show that quantities of dioxin, herbicides, phenols and other manufacturing wastes are present on the Vertac site.

17. Dioxin and other manufacturing wastes can and have been transported off the Vertac site on dust, by the action of surface water, the infiltration of groundwater into the landfill areas and equalization basin area and when people and equipment move to and from the Vertac site.

18. Samples show that dioxin has been transported off the Vertac site into fish and sediment in Bayou Meto, and also into the Jacksonville sewage treatment plant.

19. Although some measures have been taken to decontaminate the site, the following exposed areas still provide a source whereby dioxin and other wastes escape off site:
a) Reasor-Hill Landfill Area;
b) Hercules-Transvaal landfill area and "old barrel storage area";
c) The equalization basin itself and discharges therefrom.

20. While it has been known for some time that dioxin was fairly toxic, it has only been during the last few years that the extreme toxicity of dioxin has been known.

21. Considering the toxicity alone of a chemical such as dioxin, it is not sufficient to determine whether it is a health hazard. The dosage and whether there is actual exposure to that chemical and the extent of the exposure must also be considered.

22. Levels of dioxin as high as 111 parts per million ("ppm") have been found in the toluene still bottoms on the Vertac site. The toluene is a solvent used in the manufacture of trichlorophenol on the Vertac site. The still bottoms are either stored in monitored barrels or are buried beneath the ground.

23. The soil in the area where Vertac stored barrels of toluene still bottoms above ground contains various levels of dioxin up to 559 parts per billion ("ppb"). This dioxin most probably came from the substance stored in the barrels leaking onto the ground.

24. The EPA Science Advisory Panel believes that the "no observable effect level" (NOEL) for dioxin is 0.001 micrograms per kilogram (ug/kg) of body weight per day.

25. Although dioxin has been found in the sediment of the cooling pond, test results of the water being discharged from the cooling pond contained no detectable dioxin.

26. The highest concentration of dioxin found in the sediment of Rocky Branch creek on the plant site is 1,090 ppt.

27. Dioxin is found further downstream in Rocky Branch Creek at levels up to 384 ppt.

28. With the exception of one finding of 1600 ppt, the levels of dioxin in the sediment of Bayou Meto range only up to 70 ppt.

29. There are significant levels of dioxin found in the sediment in the equalization basin and Jacksonville Sewage Treatment Plant.

30. Dioxin has very little, if any, solubility in water. Although little is known about the vapor pressure of dioxin, the evidence indicates that it has low volatility.

31. Most if not all of the buried dioxin in the Hercules-Transvaal Landfill area is in toluene still bottoms which generally have a consistency like tar, pitch, or a rubber ball.

32. On June 15, 1979, following meetings between representatives of Vertac, EPA, Hercules and the Arkansas Department of Pollution Control & Ecology, the State agency issued an administrative Order directing that certain procedures be taken on the plant site as an interim measure to prevent further discharge of contaminants into the environment. Vertac agreed to the terms of the Order, which were substantially (1) that the wastes contained in the above-ground barrel storage area would be inventoried, redrummed where necessary to prevent leakage, and removed to a roofed, secured storage area pending final disposition; (2) that the area used for the above-ground barrel storage area would, after removal of the barrels to the new storage area, be delineated, the highly contaminated wastewater and soils removed, and the remaining surface of the ground covered to prevent surface runoff; (3) that sampling and analytical activities were to be undertaken on and off of the property, and engineering studies done of the plant site; (4) that the underground burial areas were to be delineated, dikes constructed to divert surface water away from those areas, and the areas were to be capped by an impermeable covering to prevent infiltration. Vertac was also to maintain and provide the State agency and EPA with certain records regarding its activities in complying with this Order and medical records regarding its activities in complying with this Order and medical records of employees, and upgrade employee equipment and safety measures. Certain timetables were established for the completion of each portion of the Order. Vertac contends, the State agency agrees, and the Court finds that Vertac has substantially complied with the terms and provisions of the Order.

33. The use of 2,4–D is of great importance to the production of rice in Arkansas and elsewhere.

34. Vertac manufactures a substantial portion of the American production of 2,4–D. Its importation into the United States from foreign sources is permitted.

## CONCLUSIONS OF LAW

■ We need look no further than our own Court of Appeals to find the guidelines for the issuance of a preliminary injunction in this case. *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492 (8th Cir. 1975) is one of the most significant decisions in the field of environmental law. In that case the court *en banc* reversed some aspects of a preliminary injunction issued by Judge Miles Lord closing Reserve's plant located on the shores of Lake Superior, because of the discharge of taconite "tailings" into the lake and ambient air. "The trial court, not having any proof of actual harm, was faced with a consideration of 1) the probabilities of any health harm and 2) the consequence, if any, should the harm actually occur." *Id.* at 519. Just as in *Reserve* there exists in the present case no proof of actual harm sustained from the escape of dioxin from the premises of Vertac. There is proof that a number of Vertac employees did develop chloracne a skin pathology, after a "blowout" at the plant several years ago. It has been conceded that Vertac has installed modifications to prevent a recurrence of such an event in the future. The question presented here is whether dioxin is now escaping from the Vertac premises in sufficient quantities to justify a preliminary injunction. On the record, the best that can be said is that the existence of dioxin in the

sediment of Bayou Meto, the equalization pond, the cooling pond, and Jacksonville sewage treatment plant, and in the soil of the Vertac site gives rise to a reasonable medical concern for the public health. The public exposure to dioxin creates some health risk. As much as humanly possible this risk must be removed. We adhere to the view of the Eighth Circuit in *Reserve* that "the existence of this risk to the public justifies an injunctive decree requiring abatement of the health hazard on reasonable terms as a precautionary and preventive measure to protect the public health." *Id.* at 520.

In so doing we are not unmindful that the proof with respect to the harmful effect of dioxin on humans is far from conclusive. Its potential effect on humans has necessarily been extrapolated from extensive animal testing. Unquestionably, acute dosage fed to animals has shown dioxin to be a killer of unprecedented effectiveness. However, we are here concerned with chronic exposure to dioxin in the most minute quantities. The expert testimony in this case spoke to concentrations of dioxin in order of parts per million, billion, trillion, and even quadrillion range. Such minute quantities baffle the imagination. One expert said that the existence of one part per trillion was analogous to comparing the width of a hair to the distance between the earth and the moon or comparing the size of a grain of sand to a concrete wall a foot thick, eight feet high and a mile long.

Nevertheless, even in such minute quantities dioxin has been a source of concern to the scientific community since the late 1960s, principally because of two events—

the use of a mixture of 2,4–D and 2,4,5–T known as "Agent Orange" as a defoliate in Vietnam and a study in the Bionetics Research Laboratories indicating that dioxin caused teratogenic effects (birth defects) in mice and rats. Charges were made that Agent Orange had damaged human, animal and plant life in Vietnam, and the resulting controversy sometimes reached highly emotional levels, which were widely reported by the press. This controversy, even before the instant case, was not unknown to the United States District Court for the Eastern District of Arkansas or the Court of Appeals for the Eighth Circuit. *Dow Chemical Co. v. Ruckelshaus,* 477 F.2d 1317 (1973). Some background information is pertinent to an understanding of the latter case. In late 1969, President Nixon's Science Advisor announced the Bionetics findings and reported that government actions would be taken to restrict the use of 2,4,5–T. On April 15, 1970, the Secretaries of Agriculture, Interior, and Health, Education, and Welfare announced suspension of the registration of 2,4,5–T for 1) all aquatic use and 2) liquid formulations for home and recreational use. This announcement was followed on May 1, 1970, by a notice of cancellation of the registration of 2,4,5–T for 3) granular formulations for home and recreational use and 4) all uses on food crops intended for human consumption.[7]

Following these actions, Dow Chemical Co. and other registrants challenged the cancellation of registration as to rice and requested referral to an advisory committee. While that committee was studying the problem, the regulation of pesticides and herbicides was transferred from the United States Department of Agriculture

7. Under the Federal Insecticide, Fungicide and Rodenticide Act statutory scheme in effect at the time, suspension of registration was a more drastic step than cancellation. Suspension was permitted upon a finding of imminent hazard to the public and could occur without advance notice to the registrant. Cancellation, on the other hand, became effective only thirty days after service of notice and could be delayed by a request for public hearing or referral to an advisory committee. If such a request was made, cancellation could not become final until after the hearing or the report of the advisory committee. 7 U.S.C. § 135b(c), as amended by Act of May 12, 1964, Pub.L. No. 88–305, § 3, 78 Stat. 190. The FIFRA scheme has since been replaced by the procedures set out in the Federal Environmental Pesticide Control Act of 1972, 7 U.S.C. §§ 136 et seq., Pub.L. No. 92–516, 86 Stat. 975, as amended by Act of Dec. 28, 1973, Pub.L.No. 93–205, 87 Stat. 903, and Act of Nov. 28, 1975, Pub.L. No. 94–140, 89 Stat. 754.

to the Environmental Protection Agency (EPA).[8]

On May 7, 1971, the nine-member advisory committee submitted its report to the Administrator of the EPA. After evaluating the available information on 2,4,5–T and TCDD, the committee

found that the data concerning the effects on human beings in exposed areas was inconclusive. It was thus necessary to extrapolate the animal data to man.

Within this framework, the committee concluded that "current patterns of usage of 2,4,5–T and its known fate in various compartments in the environment, including the plant and animal foods of man, are such that any accumulation might constitute a hazard to any aspect of human health is highly unlikely." This conclusion, however, was accompanied by a caveat that the toxic contaminant TCDD could pose a problem to human health, although a level of 0.1 parts per million of TCDD in 2,4,5–T would probably be acceptable. 36 Fed.Reg. 14777 (1971).

On August 6, 1971, after considering the report of the advisory committee, the Administrator of the EPA issued an order continuing the cancellation of 2,4,5–T for use on food crops until completion of the public hearing process. 36 Fed.Reg. 14777 (1971). In response to Dow's objections to this order, the Administrator issued a further order on November 4, 1971, reaffirming the earlier order and stating that his action was mandated by the following facts:

1. A contaminant of 2,4,5–T—Tetrachlorodibenzoparadioxin (TCDD, or dioxin)—is one of the most teratogenic chemicals known. The registrants have not established that 1 part per million of this contaminant—or even 0.1 ppm—in 2,4,5–T does not pose a danger to the public health and safety.

2. There is a substantial possibility that even "pure" 2,4,5–T is itself a hazard to man and the environment.

3. The dose-response curves for 2,4,5–T and dioxin have not been determined, and the possibility of "no effect" levels for these chemicals is only a matter of conjecture at this time.

4. As with another well-known teratogen, thalidomide, the possibility exists that dioxin may be many times more potent in humans than in test animals (thalidomide was 60 times more dangerous to humans than to mice, and 700 times more dangerous than to hamsters; the usual margin of safety for humans is set at one-tenth the teratogenic level in test animals).

5. The registrants have not established that dioxin and 2,4,5–T do not accumulate in body tissues. If one or both does accumulate, even small doses could build up to dangerous levels within man and animals, and possibly in the food chain as well.

6. The question of whether there are other sources of dioxin in the environment has not been fully explored. Such other sources, when added to the amount of dioxin from 2,4,5–T, could result in a substantial total body burden for certain segments of the population.

7. The registrants have not established that there is no danger from dioxins other than TCDD, such as the hexa- and hepta-dioxin isomers, which also can be present in 2,4,5–T, and which are known to be teratogenic.

8. There is evidence that the polychlorophenols in 2,4,5–T, may decompose into dioxin when exposed to high temperatures, such as might occur with incineration or even in the cooking of food.

9. Studies of medical records in Vietnam hospitals and clinics below the district capital level suggest a correlation between the spraying of 2,4,5–T defoliant and the incidence of birth defects.

10. The registrants have not established the need for 2,4,5–T in light of the above-mentioned risks. Benefits from 2,4,5–T should be determined at a public hearing, but tentative studies by this agency have shown little necessity for those uses of

8. Reorg.Plan No. 3, of 1970, § 2(a)(8)(i), eff. Dec. 2, 1970, 35 Fed.Reg. 15623, 84 Stat. 2086.

2,4,5–T which are now at issue. *Dow Chemical Company v. Ruckelshaus*, 477 F.2d 1317, 1320–1321 & n. 14 (8th Cir. 1973).

Dow then filed an action in the United States District Court for the Eastern District of Arkansas seeking injunctive and other relief against the Administrator's decision. At the suggestion of the court, the Administrator entered a further order on April 13, 1972, continuing the cancellation of registration and reiterating his earlier findings of fact. *Id.* The district court, concluding that the Administrator had not followed the procedures mandated by FIFRA, then enjoined further EPA proceedings against 2,4,5–T until entry of an order complying with FIFRA. *Id.* at 1321–1322. On appeal, the Eighth Circuit reversed on the ground that the Administrator had not yet entered a final order subject to judicial review. *Id.* at 1326.

With the Dow litigation terminated, the EPA resumed its administrative proceedings against 2,4,5–T. On July 19, 1973, the Administrator issued a notice of intent to order a consolidated public hearing on all registered uses of 2,4,5–T (including use for rice) in April, 1974. 38 Fed.Reg. 19860 (1973). He further ordered that the following issues (in addition to the ten issues delineated in his orders of November 4, 1971, and April 13, 1972) be addressed by the hearing:

A. The health hazards to man and other animals which may be caused by 2,4,-5–T and TCDD, with emphasis on teratogenicity, other adverse reproductive effects, mutagenicity, carcinogenicity, sub-lethal chronic health effects, and delayed lethality from chronic, low-level exposure.

B. The extent of the health risk posed by 2,4,5–T and TCDD, including thermal generation of additional TCDD in the environment, persistence and bioaccumulation of 2,4,5–T and TCDD, avenues of human and animal exposure (such as aerial drift and water transport), accumulation of residues in the human food supply and in human and animal tissue, presence in 2,4,5–T of contaminants other than TCDD, other environmental sources of dioxins, current levels of dioxins in 2,4,5–T products, and current methods of manufacture of 2,4,5–T.

C. The necessity for the continuation of the registered uses of 2,4,5–T.

38 Fed.Reg. 19859–19860 (1973).

The start of the hearing was to be delayed to permit the EPA to complete an environmental and human monitoring project on the presence of TCDD in 2,4,5–T and the extent to which TCDD may adversely affect human and animal health. 38 Fed.Reg. 19860 (1973). Early in 1973 two Harvard researchers, Professor Matthew S. Meselson and Dr. Robert Baughman, had reported the development of a method for achieving accuracy in detecting TCDD in the part per trillion (ppt) range. The EPA monitoring program was intended to employ this refined analytical method. Although difficulties with the technique had become apparent by early 1974, an Administrative Law Judge refused a request by the EPA to delay the hearing beyond May, 1974. On May 10, 1974, however, the Administrator issued an order postponing the consolidated hearing until November 1, 1974, to permit the hearing to be expanded to include all registered herbicides derived from 2,4,5–trichlorophenol, including silvex and erbon. 39 Fed.Reg. 17466 (1974).

The methodological problems in monitoring TCDD residues continued. As a result of these difficulties, on June 24, 1974, the Administrator withdrew the notices of intent to hold hearing on all registered uses of 2,4,5–T and other herbicides derived from 2,4,5–trichlorophenol and further withdrew the order of cancellation insofar as it related to rice only. 39 Fed.Reg. 24049 (1974). The order left in effect the suspension of registration of 2,4,5–T for (1) all aquatic uses and (2) liquid formulations for home and recreational use and the cancellation of registration of 2,4,5–T for (3) granular formulations for home and recreational use and (4) all uses on food crops intended

for human consumption except rice. *Id.* The stated reason for discontinuing administrative proceedings was the scientific unavailability of evidence which would largely determine their outcome. 39 Fed.Reg. 24050 (1974).

On February 28, 1979 the Administrator of the Environmental Protection Agency ordered emergency suspensions of the forestry rights-of-way and pasture uses of 2,4,-5–T. The Administrator also issued notices of cancellation of these uses of 2,4,5–T. In his opinion the Administrator stated as follows:

> During the past ten months, the Agency has been gathering information about 2,4,5–T (2,4,5–Trichlorophenoxyacetic Acid) through its Rebuttable Presumption Against Registration (RPAR) process in order to decide whether registration of this pesticide should be continued (43 FR 17116, April 21, 1978). This review was prompted by studies showing that 2,4,5–T and/or its dioxin contaminant, 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD), caused reproductive and oncogenic effects in test animals. During the public debate initiated by the 2,4,5–T RPAR, the Agency received reports that women living in the vicinity of Alsea, Oregon, had miscarriages shortly after 2,4,5–T was sprayed in the forest areas where they reside. The Agency investigated the circumstances surrounding these reported miscarriages and compared the frequency of miscarriage in the Alsea area with comparable data from a control area. The Agency has concluded that the use of 2,4,5–T over a six-year period in the Alsea area was related to a statistically significant increase in the frequency of miscarriages by women residents of the area, and that these miscarriages occurred shortly after the use of 2,4,5–T in the area where these women lived. 44 Fed.Reg. 15874 (3–15–79).

As a basis for suspension of 2,4,5–T, the Administrator set forth in great detail the results of animal testing indicating that the effect on the tested animals was fetotoxic, carcinogenic, teratogenic, and mutagenic.

The history of the Alsea, Oregon miscarriages mentioned, *supra* were also set forth in detail, with the Administrator concluding as follows:

> In my judgment, the information which has recently come to my attention as a result of the Alsea study constitutes a dramatic and troubling new point of departure for analysis of TCDD exposure concerns. As indicated above, these data show a striking relationship between 2,4,-5–T use and increased incidences of spontaneous abortions among women residing in the use area. As further developed above, this effect is an effect which one would have predicted as a likely outcome of human exposure, based upon a bond of animal data of almost unprecedented conclusiveness. The Alsea study, to be sure, contained no data showing actual exposure. However, concern for the health of humans who may be exposed to 2,4,5–T and its contaminant, TCDD, is heightened because scientists have not demonstrated that there is a level of exposure that has no adverse effects in humans. Thus, in the face of the highly significant relationship which the study showed, and the animal data, I conclude it is reasonable and in the public interest to assume that the women in the Alsea study were exposed to TCDD. *Id.* at 15884.

On February 29, 1980 the Administrator filed a notice of a hearing to cancel the registration of 2,4,5–T as a pesticide and herbicide. 45 Fed.Reg. 13527 (2–29–80). The hearing is in progress at the present time.

In relating the above history, the Court has borrowed heavily from the detailed and scholarly opinion of Judge Skopil in *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908 (D.Or.1977).

■ *The Clean Water and Resource Conservation and Recovery Acts.* Because of the language of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. (RCRA) and the Clean Water Act, 33 U.S.C. § 1251, et seq. (FWPWA), the parties have focused their attention on whether discharges from the Vertac site constitute

"imminent and substantial endangerment." 33 U.S.C. § 1364, 42 U.S.C. § 6973. In order to interpret this language in the context of a preliminary injunction, we must again consult *Reserve*. The medical and scientific opinions and testing adduced in this case clearly lie "on the frontiers of scientific knowledge." *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 474 (1974). While there may be a low probability of harm from dioxin as defendants contend, there is a serious and dire risk from exposure to dioxin should the hypotheses advanced by the plaintiffs prove to be valid. "These concepts of potential harm, whether they be assessed as 'probabilities and consequences' or 'risk and harm', necessarily must apply in a determination of whether any relief should be given in cases of this kind in which proof with certainty is impossible." *Reserve Mining Co. v. Environmental Protection Agency, supra*, at 520.

The significant portion of the Clean Water Act reads as follows:

Notwithstanding any other provision of this chapter, the Administrator upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons . . . may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary." 33 U.S.C. § 1364.

As in *Reserve* we must determine whether "endangerment" within the meaning of the FWPCA encompasses the potential of harm to public health in the degree shown here. As to the meaning of this term, the court in *Reserve* at p. 529 quoted with approval the following language of Judge Skelly Wright in *Ethyl Corporation v. Environmental Protection Agency*:

The meaning of "endanger" is [I hope, beyond dispute]. Case law and dictionary definition agree that endanger means something less than actual harm. When one is endangered, harm is *threatened*; no actual injury need ever occur.

\* \* \* \* \* \*

"Endanger," \* \* \* is not a standard prone to factual proof alone. Danger is a risk, and so must be decided by assessment of risk.

\* \* \* \* \* \*

[A risk may be assessed] from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, or from probative preliminary data not yet certifiable as "fact." *[Ethyl] Corporation v. Environmental Protection Agency*, No. 73–2205 (D.C.Cir., Jan. 28, 1975) (dissenting op. at 11, 31–33) (emphasis in original) (footnote omitted).]

It should be observed that the above language is from the panel dissenting opinion, but that on rehearing *en banc* Judge Wright delivered the majority opinion. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1 (D.C.Cir.1976), cert. den. 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). In the context of the term "endangerment" as defined in *Reserve*, the record shows that dioxin is escaping from the Vertac plant site in quantities that under an acceptable but unproved theory may be considered as teratogenic, mutagenic, fetotoxic, and carcinogenic. Such gives rise to a reasonable medical concern over the public health. We therefore hold that the escape of dioxin into Rocky Branch Creek and Bayou Meto [10] from the plant site constitutes "an imminent and substantial endangerment to the health of persons" (33 U.S.C. § 1364, 42 U.S.C. § 6973) and is subject to abatement. We note, however, that for purposes of injunctive relief there is one profound difference in *Reserve* and Vertac. In *Reserve* defendant company was deliberately dumping 67,000 tons of taconite tail-

---

10. Bayou Meto is a tributary of the Arkansas River. The parties did not argue that it is not a navigable stream and for the purpose of this proceeding we assume it to be navigable.

ings directly into Lake Superior. Vertac has never deliberately dumped its waste into Rocky Branch Creek or Bayou Meto. The pollution by Vertac has apparently resulted from the runoff of surface water and ground water from soil and wastes containing dioxin, some of which were present long before Vertac acquired the property. In fact, at this time Vertac is not even manufacturing 2,4,5–T, a necessary by-product of which is dioxin. It is only engaged in making 2,4–D, the manufacture of which does not produce dioxin as a by-product. For these reasons we have considerable doubts as to the applicability of the Refuse Act, 33 U.S.C. § 407 [11] and do not consider any such alleged violation for the purpose of this proceeding. Vertac could scarcely be expected to secure a permit from the Secretary of the Army to discharge wastes into Rocky Branch Creek, when it claims that it is making no discharge at all into this stream and such discharge of pollutants as is occurring is purely involuntary. We do not find it necessary to decide whether defendants are in violation of the Refuse Act for the purpose of this proceeding.

The Arkansas Acts on which the State relies require no departure from the principles set forth, *supra*. The pertinent sections of the Arkansas Water and Air Pollution Control Act (Ark.Stat.Ann. §§ 82–1908, 1909 (1976 Repl.Vol.)) make it unlawful "to cause pollution . . . of any of the waters of the State" and provide for injunctive relief. The Arkansas Hazardous Waste Management Act [Ark.Stat.Ann. §§ 82–4208, 4212, 4213 (1979 Pocket Supp.)], on which the State relies, provides that the Director of the Department of Pollution Control and Ecology "upon finding that the storage, transportation, treatment, or disposal of any waste may present an imminent and substantial hazard to the health of persons or to the environment and that an emergency exists. . . . may, without notice or hearing, issue an order reciting the existence of such an imminent hazard and emergency and requiring that such action be taken as he determines to be necessary to protect the health of such persons and/or the environment and to meet the emergency." *Id.* at § 82–4208.

## THE REMEDY

◼ *Vertac.* In devising a remedy based on the findings of fact and conclusions of law set forth above, we again follow the guidelines set forth in *Reserve*. We must strike a proper balance between the benefits conferred and the hazards created by Vertac's facility. *Reserve* sets out the factors to be considered: a) the nature of the anticipated harm, b) the burden on Vertac and its employees from the issuance of the injunction, c) the financial ability of Vertac to convert to other methods of waste disposal, and d) a margin of safety for the public.

◼ We have discussed in detail the anticipated harm, *supra*. The mandatory in-

---

**11.** Section 407 (the Refuse Act) reads in relevant part:

§ 407. Deposit of refuse in navigable waters generally.

It shall not be lawful to throw, discharge, or deposit, * * · * any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water . . . provided * * * that the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.

Section 16 of the Rivers and Harbors Act (33 U.S.C. § 411) contains criminal sanctions, but the Supreme Court has held that language in the enforcement section (§ 17) is sufficiently broad to encompass civil suits for injunctive relief. *United States v. Republic Steel Corp.,* 362 U.S. 482, 491–492, 80 S.Ct. 884, 889–890, 4 L.Ed.2d 903 (1960); *see Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 201–04, 88 S.Ct. 379, 385–387, 19 L.Ed.2d 407 (1967); *see also United States v. Rohm & Haas Co.,* 500 F.2d 167 (5th Cir. 1974, cert. denied, 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975); *Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81, 88–90 (2d Cir. 1972).

junction which we propose to issue will not cast an undue burden on Vertac, since we will not direct action on Vertac's part which would necessarily close the facility. The United States has asked that Vertac stop discharging its present waste into the equalization pond. This would have the effect of immediately closing the facility. At present the discharged wastes do not contain dioxin since Vertac is not manufacturing 2,4,5–T. The United States postulates that a residue of dioxin may remain in the 2,4–D waste since the same facilities are utilized in the manufacture of 2,4–D as were utilized in the manufacture of 2,4,5–T a year ago. Such has not been proved in these proceedings. Furthermore, Vertac has substantially completed the necessary engineering plans for a proposed new system for the equalization pond. The injunction will contain appropriate orders concerning this system. The court will order that those areas where the soil samples contain dioxin are to be covered with a clay topping and sodded with grass. These measures Vertac has agreed to take. Vertac will also be ordered to construct an underground clay barrier to the north and east of the Reasor-Hill landfill, which it has also agreed to do. Vertac will also be required to institute systematic sampling procedures from each of the monitoring wells presently on the property. The court may in the future require additional monitoring wells after the assessment of the results from the measures now being ordered.

None of these measures are beyond the financial ability of Vertac to undertake. Indeed it has agreed on the record to move forward immediately with regard to all of them. The Court is not disposed to order closure of a facility employing about seventy-five people and producing a herbicide which is of great value to the rice farmers of this state. Testimony was adduced indicating that Vertac manufactures a substantial portion of the total U.S. supply of this product and that its closure would entail foreign imports at a higher cost to rice farmers. Vertac has not been recalcitrant in its dealings with either the State or the United States. After the June 15, 1979

order of the Arkansas Department of Pollution Control & Ecology made with the consent of all the parties to this litigation, Vertac closed down its plant and immediately began working on the mandates contained in this order. The State has stipulated that there has been substantial compliance with the order.

In its complaint the United States objected to the presence of chlorinated phenols in the waste from Vertac's plant discharged into its equalization pond and thence into the Jacksonville sewage treatment plant. It also objects to the presence of chlorobenzene, ethylbenzine, toluene, DDT, DDE, and dieldren, which it alleges have been found on the Vertac site. Some of these represent the residue from insecticides manufactured many years ago on this site. Very little proof was offered in this proceeding on either the presence of these chemicals or their effect on humans or the environment. We do not consider the presence of these substances on the issue of a preliminary injunction.

Both government parties presented some proof on air pollution, which we did not find convincing. At the time of the blowouts described, *supra*, there was undeniably air pollution for a limited time. These "blowouts" now have been controlled. For the purpose of the present hearing, we do not consider the question of air pollution, particularly since Vertac is no longer producing 2,4,5–T.

With respect to the problem of fashioning a remedy, we allude as did the Court of Appeals in *Reserve* to the language of *Aberdeen & Rockfish R. R. v. SCRAP*, 409 U.S. 1207, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972):

Our society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps. These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of "environmental damage" is asserted. * * * The decisional process for judges is one of balanc-

ing and it is often a most difficult task. [*Id.* at 1217–1218, 93 S.Ct. at 7.]

█ To paraphrase the Court of Appeals in *Reserve*, Vertac must be given a reasonable opportunity and a reasonable time to accomplish an abatement of its pollution and the health risk created thereby. In this way, hardship to employees and great economic loss incident to an immediate plant closing may be avoided. We cannot ignore the potential for harm in Vertac's discharges. This potential imparts a degree of urgency to this case that would otherwise be absent from an environmental suit in which ecological pollution alone was proved. The measures which the court will order must therefore be circumscribed by realistic time limitations.

*Hercules.* The government parties strenuously argue that any mandatory injunction be directed against Hercules as well as Vertac. We decline to order Hercules to do anything *at this time.* Hercules has not been on this site for almost ten years and at present has no ownership interest in the property. The United States argues that Hercules created a continuing nuisance, citing 66 C.J.S. Nuisances § 85 (1950) and 58 Am.Jur.2d Nuisances § 51 (1971) and that the sale of the property does not insulate it from liability, citing *Mosby v. Manhattan Oil Co.*, 52 F.2d 364 (8th Cir. 1931); *Phillips Petroleum Co. v. Hardee*, 189 F.2d 205 (5th Cir. 1951); and *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731 (1952). The State cites in addition *Rhodia, Inc. v. Harris County*, 470 S.W.2d 415 (Tex.Civ.App.1971); *Texas Pet Foods, Inc. v. State of Texas*, 529 S.W.2d 820 (Tex.Civ.App.1975); *Moss Industries v. Irving Metals Co.*, 140 N.J.Eq. 484, 55 A.2d 30 (1947); *Kamke v. Clark*, 268 Wis. 465, 67 N.W.2d 841 (1955); *State v. Exxon Corp.*, 151 N.J.Super. 464, 376 A.2d 1339 (1977); *People v. Gold Run Ditch and Mining Co.*, 66 Cal. 138, 4 P. 1152 (1884); *Norton v. Colusa Parrot Mining and Smelting Co.*, 167 F. 202 (C.C.Mont.1908); *Madison v. Ducktown Sulphur, Copper and Iron Co.*, 113 Tenn. 331, 83 S.W. 658 (1904).

Hercules also relies on *Rhodia, Inc. v. Harris County, supra,* and *State v. Exxon, supra,* as well as *Pennsylvania Public Utility Comm. v. General Waterworks Corp.*, 7 Pa.Cmwlth. 352, 300 A.2d 280 (1973); *Midland Empire Packing Co. v. Yale Oil Corp.*, 119 Mont. 36, 169 P.2d 732 (1946); *Wright v. Standard Oil Co.*, 234 Iowa 1241, 15 N.W.2d 275 (1944). It argues that the court does not have power to issue a mandatory injunction requiring Hercules to take any action with regard to property that it does not own. Hercules also argues that the Resource Conservation and Recovery Acts (RCRA) and Section 1364 of The Clean Water Act became law after it left the plant site and cannot be applied retroactively, citing *Brewster v. Gage*, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457 (1930); *Maryland v. Amerada Hess Corp.*, 350 F.Supp. 1060 (D.Md.1972) and *State v. Exxon Corp., supra.*

We see no occasion to enter this judicial thicket. Vertac has expressed a willingness to comply with the orders which the Court proposes to enter. Hercules has stated in open court that it will pay its fair share of clearing and protective operations on that part of the premises where it buried waste materials. These parties have indicated that they have already been negotiating with respect to this issue. Hopefully, the intervention of the court will not be necessary to allocate costs between Vertac and Hercules. If they cannot agree, the court can make a cost allocation at some future date on a cross petition by Vertac. This procedure would seem to the Court to be the most orderly, expeditious and economical for all concerned.

### PRELIMINARY INJUNCTION

In accordance with the foregoing, the Court herewith issues its mandatory preliminary injunction and requires that Vertac take the following measures:

(1) The clay covering which was placed over the Reasor-Hill burial area in 1979, pursuant to the State agency Order of June 15, 1979, and which has eroded, must be restored and repaired to prevent penetra-

tion of surface water into the underground burial area. Upon restoration of the cover, the clay shall be covered with top soil. Grass shall be seeded or some other vegetation placed over the area to prevent future erosion. In addition, clay cut-off or containment walls shall be constructed around the north and east portions of the Reasor-Hill area to prevent the movement of groundwater through the dump area into Rocky Branch Creek. This work shall be completed within six months from the date of this Order.

(2) Vertac shall submit to the Arkansas Department of Pollution Control and Ecology and the Environmental Protection Agency detailed engineering plans and specifications for the development and installation of a system for treatment of waste water from the plant industrial processes as an alternative to the present equalization basin. Said plans shall be submitted to those agencies within sixty (60) days from the date of this Order, and said agencies shall have thirty (30) days from date of receipt of those plans within which to review and to file a notice of approval or disapproval with the Court. In the event of approval by the agencies, Vertac shall have a period of six months to implement the new system pursuant to the engineering plans. In the event one or both agencies disapprove the plans, the Court will promptly hear the dispute and establish a new time table.

(3) Vertac shall proceed to cover the Hercules-Transvaal-Vertac Waste Burial areas and the old barrel storage area in the north portion of the plant site with an impermeable clay cover to prevent, insofar as possible, the penetration of said underground areas by surface waters. The clay cover shall then be covered with topsoil and seeded with grass or covered with some other form of vegetation to prevent erosion. Work on this area shall be completed within ninety (90) days from the date of this Order.

(4) Vertac shall proceed to cover the "blow-out" area to a distance not less than two hundred (200) feet east, north and west of the TCP reactor vessels. The cover should be of an impermeable clay material to prevent the penetration of said area by surface waters, and should thereafter be covered with top soil and seeded with grass or covered with some other vegetation. If, in the opinion of Vertac personnel, the area will not support vegetation, the cover material should be of asphalt or other permanent material. This work should be completed within one hundred twenty (120) days from the date of this Order.

(5) Vertac shall collect, label and keep separate samples from each of the monitoring wells presently on the property and from the water and sediment of Rocky Branch Creek at the south fence line on a monthly basis. These samples should be delivered to the Arkansas Department of Pollution Control and Ecology and the Environmental Protection Agency for analysis. If representatives of these agencies submit a request in writing, they may be present at the taking of the samples.