UNITED STATES of America, Plaintiff,

v.

Charles PRICE, individually and d/b/a Price's Trucking Company; Virginia Price; Carl F. Price; and Bernard Abramoff, Lee Garell, and Frank Abramoff, individually and d/b/a A.G.A. Partnership, Defendants.

ATLANTIC CITY MUNICIPAL UTILITIES AUTHORITY, Plaintiff-Intervenor,

v.

Charles PRICE, individually and d/b/a Price's Trucking Company; Virginia Price; Carl F. Price; and Bernard Abramoff, Lee Garell, and Frank Abramoff, individually and d/b/a A.G.A. Partnership, Defendants.

Civ. A. No. 80–4104.

United States District Court, D. New Jersey.

Sept. 23, 1981.

William W. Robertson, U.S. Atty., by Charles J. Walsh, First Asst. U.S. Atty., Michael V. Gilberti, Sp. Asst. U.S. Atty., Newark, N.J., for plaintiff.

John L. Miller, Jr., Miller & Daniels, Cherry Hill, N.J., and Robert E. Gladden, Gladden, Brierley & Paglione, Camden, N.J., for Price defendants.

John P. Hauch, Jr., Archer, Greiner & Read, Haddonfield, N.J., for A.G.A. defendants.

BROTMAN, District Judge.

For fundamental and deeply rooted psychological reasons, as well as more mundane utilitarian considerations, it is characteristic of man to bury that which he fears and wishes to rid himself of. In the past, this engrained pattern of behavior has generally proven harmless and, indeed, has often led man to restore to the earth the substances he had removed from it. In today's industrialized society, however, the routine practice of burying highly toxic chemical wastes has resulted in serious threats to the environment and to public health. *See* Note, *An Analysis of Common Law and Statutory Remedies For Hazardous Waste Injuries*, 12 Rut.L.J. 117, 117–22 (1980). The dangers are especially acute when buried chemical wastes threaten to contaminate the underground aquifers, upon which half of the nation relies for its supply of drinking water. *Id.* at 121.

The United States brought the instant action for injunctive relief to remedy the hazards posed by chemical dumping that occurred at Price's Landfill in Pleasantville, New Jersey during 1971 and 1972. The action was brought pursuant to section 1431 of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300i, section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the federal common law of nuisance. Defendants are the present owners of the now dormant landfill and the persons who owned and managed the landfill in the early 1970's when it was in operation. Currently being considered by the court are the government's motion for a preliminary injunction and defendants' motions for summary judgment and to compel the joinder of additional defendants. In accord with Rule 65, Fed.R.Civ.P., the court now renders the following findings of fact and conclusions of law.[1]

### FINDINGS OF FACT

I. *The Parties and Their Relation to the Litigation*

1. Plaintiff is the United States of America, acting on behalf of the Administrator of the Environmental Protection Agency (E.P.A.).

2. The Atlantic City Municipal Utilities Authority (ACMUA) has intervened as a plaintiff. The ACMUA owns the Atlantic City Water Department, which supplies water to approximately 10,600 domestic, commercial and public users in Atlantic City. The system contains approximately 10,000 connections and relies upon both sur-

1. The court wishes to thank the attorneys for the government for the thorough proposed findings that they submitted. These were typi-

cal of the exemplary fashion in which the government has presented this case.

face and well water. All raw water is treated at the ACMUA's treatment plant in Pleasantville, New Jersey.

3. Defendants are Charles Price, individually and d/b/a Price's Trucking Company, Virginia Price, and Carl Price (Collectively referred to as the Price defendants); and Bernard Abramoff, Lee Garell, and Frank Abramoff, individually and d/b/a A.G.A. Partnership (Collectively referred to as the A.G.A. defendants).

4. Charles Price and his wife, Virginia Price, are residents of Atlantic County, New Jersey. Price Trucking Company is a sole proprietorship owned and operated by Charles Price, which was formed in or about 1937.

5. From January 18, 1960 to January 19, 1979, Charles and Virginia Price owned a twenty-two acre lot situated on the border of the City of Pleasantville and the Township of Egg Harbor, commonly referred to as Price's Landfill Number 1 (Price's Landfill). That property is the subject of this litigation.

6. Carl Price, the brother of Charles Price, resides in Atlantic County, New Jersey. From 1969 until 1976, Carl Price managed, supervised, and operated Price's Landfill on behalf of his brother.

7. Bernard Abramoff, Lee Garell, and Frank Abramoff comprise a general partnership known as A.G.A. Partnership. Each of the partners resides in or maintains a residence in Atlantic County, New Jersey.

8. A.G.A. Partnership is a New Jersey general partnership, which was formed for the purpose of purchasing and reselling for profit real estate in the Atlantic County area.

9. On November 13, 1978, Lee Garell, on behalf of A.G.A. Partnership, entered into a purchase agreement with Charles and Virginia Price to purchase Price's Landfill, and, on January 19, 1979, A.G.A. purchased the property.

10. During the negotiation period, Charles Price advised Garell that the property had been used as a landfill. Further, he requested that A.G.A. formally acknowl-edge that the property had been used as a landfill and assume responsibility for the property. Price did not specifically advise Garell that chemical wastes had been dumped on the property.

11. At the closing, on January 19, 1979, Garell, for A.G.A. Partnership, signed an acknowledgment stating that:

> Buyer hereby acknowledges that the property [Price's Landfill # 1] was used as a landfill and accepts it as is, with no responsibility from seller.

12. Under the laws of New Jersey, a licensed broker has an obligation to inquire of a seller about any conditions on his property that may materially affect the value of the property. At least as of 1975, both Lee Garell and Bernard Abramoff, two of the partners in A.G.A., were brokers licensed by the State of New Jersey.

13. The presence of the chemicals and toxic wastes buried at the landfill was a condition that affected the value of the landfill, but Garell made no inquiry to determine whether such wastes were present.

14. No one from or acting on behalf of A.G.A. visited the property before A.G.A. purchased it. The surface condition of the property would not have revealed that toxic wastes were buried there, although several monitoring wells were present and visible. A.G.A. made no inquiry of Price as to when the landfill was properly closed, and there was no requirement in the deed or contract of sale prepared by A.G.A., or any representation from Charles Price, that the landfill had been properly closed.

15. At the time of purchase, A.G.A. was aware that building on former landfills required special construction techniques. Before taking title, however, A.G.A. made no inspection of the property and made no effort to determine what was buried at the landfill.

16. In the summer of 1979, Garell and his partners became aware from newspaper accounts that toxic chemicals had been buried at the landfill.

17. In November and December of 1979, A.G.A. received additional information

which confirmed that hazardous chemicals were buried beneath Price's Landfill.

18. At no time has A.G.A. actively disposed of any wastes at the landfill or actively contributed to the migration of contaminants from the site. Nor, however, has A.G.A. taken any steps to prevent the flow of chemical wastes from the landfill or any other action to remedy the condition present there.

19. A.G.A. purchased the property, in an arm's length transaction, for $70,000.00. This price was substantially less than the fair market value of such a property, had it not been used as a landfill, but was a reasonable price given the prior use of the property.

II. *State Action Will Not Be Effective*

20. On two occasions, once in 1974 and again in 1976, the New Jersey Department of Environmental Protection (D.E.P.) commenced actions to remedy the potential hazard posed by Price's Landfill. Those actions proved ineffective.

21. In mid-1979, E.P.A. initiated a program designed to identify, investigate, and remedy problems caused by the improper disposal of hazardous wastes. In an attempt to avoid duplication of effort and to make the best use of available resources, E.P.A. and D.E.P. met on several occasions and agreed to divide between them responsibility for existing waste disposal sites in New Jersey.

22. At that time, Price's Landfill was identified as a source of groundwater pollution, and it was agreed that E.P.A. would have primary responsibility for investigating that site and pursuing appropriate corrective action.

23. In November of 1979, E.P.A. began a site review of the landfill and began to investigate the geohydrology of the area in an attempt to determine the extent of groundwater contamination that had occurred as a result of chemical dumping at the landfill and to evaluate the likely effect of that contamination on public and private wells located nearby.

24. Since November of 1979, E.P.A. has actively studied the extent of the problem posed by Price's Landfill. Based on this study, the United States instituted this action on December 22, 1980.

III. *The Location and History of Price's Landfill*

25. Price's Landfill occupies approximately twenty-two acres extending across the boundary of Egg Harbor Township and the Town of Pleasantville, New Jersey. The landfill is roughly rectangular in shape with its longitudinal axis running north and south along the west side of Mill Road. Spruce Street runs east and west along the north side of the property. The legal description of Price's Landfill is Block 36A, Lots 3 and 6 of Egg Harbor Township, and Block 190, Lot 3 of the Town of Pleasantville.

26. On January 18, 1960, Charles and Virginia Price purchased the property known as Price's Landfill from Richard and Betty Simon.

27. From the purchase in 1960 until approximately 1967, Charles Price excavated sand and gravel from the property for use in his road contracting business.

28. In about 1968, when the pit was excavated to within approximately two feet of the water table, people from the surrounding area began to dump trash into it. Price permitted this and he had a worker periodically collect the trash in one corner of the pit and cover it.

29. In 1969, Price began to operate the property as a landfill on a commercial basis.

30. From 1969 until the landfill was closed in 1976, Carl Price worked at the site and conducted the daily operations of the landfill. He supervised the other workers, directed the disposal of wastes, including chemicals, and reported daily to Charles Price on the operation of the landfill.

31. On June 11, 1970, Charles Price, d/b/a Price Trucking Company, applied to D.E.P. for a license to conduct a sanitary landfill operation at Price's Landfill. The application listed the materials that Price

intended to accept at the landfill. Price's application specifically excluded "Chemicals (Liquid or Solid)," because Price did not, at that time, intend to dispose of chemical wastes.

32. Based on the June 11, 1970 application, D.E.P. issued a certificate permitting Price to operate Price's Landfill as a solid waste disposal facility. The certificate, which took effect on June 30, 1970, remained valid until June 30, 1971. During that time, the New Jersey State Sanitary Code required each landfill operator to submit a sanitary landfill design, which was to include a plot plan, topographical, geological and hydrological maps of the site and surrounding areas, drilling procedures, proposed final elevation of the fill, and detailed drawings of any dikes, dams, or other pollution protection devices that might be necessary. Charles Price was aware of this requirement.

33. Several bureaus within D.E.P., including the Bureau of Solid Waste Management, would review each application for certification and the accompanying engineering plan to determine whether the wastes that the operator had noted on the application would pose a threat to health or the environment, given the method of disposal and other factors indicated on the plan.

34. It was not until approximately September 29, 1971 that Price submitted an engineering plan to the D.E.P. The plan, which had been prepared by his son Ronald Price, a professional engineer, did not include any provision for the disposal of chemicals, despite the fact that the landfill was, at that time, accepting and disposing of chemical wastes. Charles Price never advised his son that the landfill was or would be accepting chemical wastes.

35. In May of 1971, Charles and Carl Price began to accept and dispose of chemical wastes at the landfill. The disposal of these wastes during 1971 occurred on a sporadic basis.

36. On June 30, 1971, Charles Price's permit to conduct a landfill operation at Price's Landfill expired. He did not file an application to renew his permit until February 11, 1972, and he never received a permit to operate for the period of June 30, 1971 to June 30, 1972. Price's February application was prompted by a D.E.P. letter of January 28, 1972, which notified Price that he had not submitted an application to renew his permit and threatened legal action if he did not promptly file such an application.

37. In his February 11, 1972 application, Price, for the first time, sought permission to accept and dispose of liquid and chemical wastes at the landfill. During this period, Price was accepting increased quantities of chemical wastes.

38. In response to Price's application, on June 30, 1972, D.E.P. granted Charles Price a certificate subject to the conditions that:

No liquid or soluble industrial wastes, petrochemicals, waste oils, sewage sludge, or septic tank wastes shall be received for disposal at this site.

Observation well(s) shall be constructed for monitoring ground water conditions no later than six (6) months from the date of issuance of the Certificate of Registration. Said observation well(s) shall be constructed according to standards established by the Department of Environmental Protection.

39. Despite the above limitations, Charles and Carl Price continued to accept and dispose of significant quantities of chemical and liquid wastes at the landfill until November, 1972.

40. These wastes were disposed of with minimal precautions. Frequently, wastes would be poured into the refuse from an open spigot on a tank truck. At other times, drums of chemicals would simply be buried under the refuse at the landfill.

41. On July 21, 1972, only three weeks after the permit prohibiting liquid wastes was issued, Alan Kaczoroski, the D.E.P. inspector responsible for the region containing Price's Landfill, inspected the landfill and cited it for accepting chemical wastes. By letter dated August 4, 1972, D.E.P. formally advised Price of the violation. Nonetheless, Price continued to accept and dis-

pose of chemical wastes in significant quantities until November, 1972.

42. Mr. Kaczoroski visited the landfill approximately every six weeks during 1970 and 1971 and somewhat more frequently during 1972. In each instance, he would walk around the site and prepare a report detailing the operation of the landfill, noting any remarkable conditions and citing any violations he observed.

43. Kaczoroski first observed chemical dumping at the landfill on February 15, 1972. He observed such dumping, as well as the signs of chemical dumping, on numerous occasions thereafter until November of 1972.

44. Kaczoroski never authorized Price to accept chemical wastes. Nor did any other official of D.E.P. ever authorize the disposal of chemical wastes at the landfill.

45. On one occasion, Kaczoroski pointed out to Carl Price that a driver was using an unsafe method to unload chemical drums, and he instructed Price to have the driver use a safer method. Other than that occasion, neither Kaczoroski nor any other D.E.P. official ever instructed Charles or Carl Price as to where or how to dispose of chemical wastes.

46. Kaczoroski was not directly responsible for permit violations and often would not be familiar with the terms of a landfill's permit. He was aware, however, that the July 30, 1972 permit issued to Price prohibited chemical dumping at the Landfill.

47. Kaczoroski regularly reported his observation of chemical dumping at the landfill to his superiors in the Bureau of Solid Waste Management at D.E.P. D.E.P. took no action to stop the disposal of chemical wastes at the landfill.

48. After November of 1972, no chemical wastes were disposed of at the landfill, although it continued in operation.

49. In 1976, Charles Price terminated the landfill operation and covered the site with fill material.

50. The property has been unused since 1976. Neither Price nor A.G.A. has conducted or permitted any dumping at the property since that time.

IV. *The Nature of the Toxic Wastes Migrating from the Landfill*

51. During the period from May, 1971 to mid-November, 1972, Charles and Carl Price accepted and disposed of approximately 9 million gallons of toxic and flammable chemical and liquid wastes in drums and directly into the ground, including acetone; acids (glycolic, nitric and sulfuric) and spent acid wastes; acryloid, acryloid monomer and poly acryloid; caulking and spent caulking solvent; caustics and spent caustic wastes; cesspool waste; chemical resins and other waste chemicals; chloroform; cleaning solvents; ether and spent ether wastes; ethyl acetate; ethylene dichloride; fatty acids; glue wastes; grease and spent grease solvents; heptane; hexane; inks and waste ink residues; isopropanol; isopropyl alcohol; isopropyl ether; lacquer thinner; manganese dioxide; methanol; methyl ethyl ketone; methyl isobutyl ketone; methyl vinyl ketone; miscellaneous chemical laboratory wastes; mineral spirits; oil and waste oil products (No. 6 waste oil); paint, paint sludge, paint thinner and spent paint wastes; perfume wastes; phenols, phenolics and phenolic solvents; resins; septic waste and sludge; still bottoms; styrene and styrene wastes; tar; titanium wastes; toluene; xylene and xylol.

52. Between 1973 and the present, 12 observation wells have been installed on or in the vicinity of Price's Landfill. In addition, there are approximately 35 private wells in the vicinity of the landfill.

53. On December 6, 1979; April 9–10, 1980; August 26, 1980; October 28, 1980; November 6, 1980; December 10–11, 1980; January 21, 1981; and January 26, 1981, employees of E.P.A. and members of the Field Investigative Team (FIT) (employees of Fred C. Hart Associates) collected water samples from monitoring wells located on and around Price's Landfill, and from public and private water wells in the vicinity of the landfill. These samples were collected using standard and generally-accepted procedures. Standard Chain of Custody, Field

Data, and Request for Analysis forms were prepared for each sample. Subsequently, the samples were transported to the E.P.A. Laboratory in Edison, New Jersey or to one of the FIT contract laboratories where they were analyzed using standard E.P.A. procedures outlined in *Methods for Chemical Analysis of Water and Wastes* and *Sampling and Analysis Procedure for Screening of Industrial Effluents for Priority Pollutants* for the 127 priority and consent decree pollutants.

54. The analysis of these samples has revealed significant contamination of the water drawn from wells on the landfill as well as the water drawn from wells in the surrounding area. The toxicological significance of this contamination will be discussed below. It is useful, however, to measure the level of contamination in terms of Water Quality Criteria (WQC) promulgated by the E.P.A. The most recent publication of these standards appeared in the Federal Register on November 28, 1980.

Testing of some of the monitoring wells and private wells has revealed the following contaminants, among others, present in the groundwater:

1. D.E.P. Well # 2 (at eastern boundary of the landfill) (sampled on April 9–10, 1980)

| | |
|---|---|
| Arsenic ----- | 1,500 times WQC |
| Vinyl Chloride --- | 346 times WQC |
| 1, 2 dichloroethane -- | 24,000 times WQC |
| Lead ----- | 14 times WQC |

2. E.P.A. Well # 6 (2,000 feet east of the landfill) (sampled on December 11, 1980)

| | |
|---|---|
| Chloroform ----- | 28 times WQC |
| Tetrachloroethylene --- | 7 times WQC |
| 1, 2 dichloroethane --- | 500 times WQC |

3. Dorsey Well (# 41) (1,000 feet north of northwest corner of landfill) (sampled on November 6, 1980)

| | |
|---|---|
| Benzene ----- | 77 times WQC |
| Methylene chloride --- | 68 times WQC |
| Arsenic ------ | 450 times WQC |

4. Opie White Well (# 15) (1,400 feet north-northeast of landfill) (sampled on November 6, 1980)

| | |
|---|---|
| Benzene ----- | 68 times WQC |
| Methylene chloride -- | 58 times WQC |
| Arsenic ----- | 450 times WQC |

At each of the above sites, many other contaminants were also found. In addition, many of the other sites tested also revealed significant levels of the above compounds as well as a variety of other metals, chlorinated hydrocarbons, and other chemical contaminants, many of which were present in amounts greatly in excess of the Water Quality Criteria.

V. *Toxicological Significance of These Contaminants*

55. In recent years, numerous chemical compounds have been identified as possible toxicants. These compounds can be categorized as organic and inorganic compounds.

Inorganic compounds include arsenic, cadmium, chromium, lead, nickel, zinc, and mercury. These metals have been widely used in industry since the 1930's. Research and experience with these compounds have led to an awareness that exposure to even low concentrations can result in adverse health effects. In addition to being toxic, some of these compounds are carcinogenic and possibly mutagenic. These metals are poorly degraded by natural processes and tend to persist in the environment.

Certain organic compounds, such as toluene, benzene, phenol, chloroform, methylene chloride, vinyl chloride, and dichloroethane have been commonly used in industry since the 1950's. The chlorinated hydrocarbons, in particular, are poorly degraded by natural processes and, therefore, tend to persist in the environment. Many of these organic compounds are capable of causing adverse health effects even at low concentrations. They are frequently hepatotoxic, nephrotoxic, and neurotoxic. Many of these compounds are also carcinogenic, teratogenic, and mutagenic.

56. Of the large number of chemical compounds in common use, relatively few are known or suspected to be capable of causing cancer. Carcinogens have been identified either by observation of tumors occurring in human populations or by controlled experiments using test animals or other organisms. These techniques, and comparable methods to determine teratogenicity and mutagenicity, have demonstrated that many of the contaminants found in the groundwater under and in the vicinity of the landfill are hazardous to the

environment and to human health. For example,

(a) arsenic is a highly toxic metal and an established human carcinogen;

(b) cadmium is a highly toxic metal and a suspected carcinogen in man, and is known to be teratogenic in animals;

(c) lead is a toxic metal and suspected of being carcinogenic and teratogenic in humans;

(d) benzene is a petroleum derived hydrocarbon, which is highly toxic as well as a potent carcinogen and teratogen;

(e) trichloromethane (chloroform) is highly toxic and a recognized carcinogen and teratogen;

(f) vinyl chloride is a toxic halogenated hydrocarbon, which is carcinogenic and suspected of being mutagenic;

(g) 1,2 dichloroethane is a toxic chlorinated hydrocarbon, which is suspected of being carcinogenic and teratogenic.

All of the above compounds have been designated as hazardous wastes and hazardous waste constituents under published E.P.A. regulations, 40 C.F.R. §§ 261.11, 261.33 and Appendix VIII, and are contaminants within the meaning of 42 U.S.C. § 300f(6). Many of the other chemical wastes emanating from the landfill are known to be toxic and are known or suspected carcinogens and teratogens.

57. Given the many contaminants that have been identified in the groundwaters surrounding Price's Landfill and the extent of contamination found, the use of wells in the immediate area of the landfill is likely to create grave hazards to human health. The presence of a significant number of these contaminants in public drinking water supplies in a quantity exceeding E.P.A. Water Quality Criteria would present an extremely serious public health problem. Indeed, the presence of any one of these contaminants in an amount significantly in excess of the relevant criterion would be a serious situation.

VI. *Geohydrological Findings*

58. Groundwater hydrology or geohydrology is the study of the character, source, and movement of underground waters. An important aspect of this science is the study of the distribution and characteristics of earth materials—such as sand, clay, and solid rock—and the effect of these materials on the quality and movement of groundwater. Geohydrology also involves the study of the relationship between groundwaters and surface waters, such as streams and lakes.

59. Contamination from improperly designed landfills can pose a major problem to public drinking water supplies and has, in the past, resulted in damage to such supplies.

60. Price's Landfill was improperly located as a landfill site in that it was placed in a geographically sensitive area—*i. e.*, an abandoned sand and gravel quarry. In general, landfills should not be located near water supply sources, should not be placed in areas underlaid by sandy soil, should not be located where the water table is less than 10 feet from the surface, and should not be situated where the ground water flows in the direction of public water supplies. Price's Landfill violates all of these site selection criteria. Landfills that are permitted to accept hazardous chemical wastes pose a particular danger and, therefore, should be located in conformity with the above site selection criteria.

61. On the surface of the earth, there is an area containing air, water, and earth materials through which the surface water moves downward. This region is called the "unsaturated zone." Below the unsaturated zone, there is a region filled with water called the "saturated zone." The boundary between the unsaturated and saturated zones is referred to as the "water table."

62. Saturated geologic deposits can be broadly divided into water yielding and water saturated but unyielding deposits, which are referred to respectively as aquifers and confining beds. Aquifers, which may cover large areas, are characterized by the free movement of waters through the

geologic deposit. This movement occurs because all aquifers have small void spaces in the deposits, referred to as pores. These pores are interconnected, enabling water to move through the deposit. The freedom of movement is described quantitatively by the hydraulic conductivity (permeability). Confining beds, by contrast, restrict the movement of groundwater. The distribution of these distinct types of deposits in an area controls the regional movement of groundwater, determines its accessibility to wells, and, where contaminants are present, affects the likelihood and movement of groundwater contamination.

63. "Head" is the elevation of groundwater—*i. e.*, the depth of the water table relative to a common reference point, normally sea level. A comparison of the elevation of the water level at three points in a region reveals the change in head, also called the slope or hydraulic gradient, of that area. The slope of the surface determined in this manner defines the direction in which underground liquids, including groundwater, will flow. Because groundwater obeys the law of conservation of energy, it will move in the direction of the maximum slope of the water table.

64. E.P.A. officials and contractors took extensive water level measurements in the area of Price's Landfill. These measurements reveal that the hydraulic gradient in the area of the landfill slopes generally east and east-northeast from the landfill.

65. The groundwater in the area, and contaminants in that groundwater, will therefore tend to flow east and east-northeast.

66. Darcy's Law allows one to determine the amount and rate of water flow from the change in pressure between various points, accounting for the hydraulic conductivity (permeability) and porosity (space between individual grains of the earth material) of the material through which the water is flowing.

67. Based upon the available geological data for the area surrounding Price's Landfill, the porosity of the landfill and of the ground between it and the ACMUA wells probably ranges between .3 and .4.

68. The hydraulic conductivity of the landfill area probably ranges between 60–70 feet per day.

69. Dissolved substances move with the groundwater as it flows along the hydraulic gradient, but not at the same velocity as the groundwater. Leachate and liquids deposited in a landfill move down through the groundwater and away from the landfill, forming a region or plume of contamination that emanates out into the aquifer. The plume follows the direction of groundwater flow and has a concentration similar to but somewhat more diluted than that at the landfill. The leading edge of the plume is dispersed and contains only trace amounts of the substances that will follow at a later time. The further and longer the plume moves, the wider the dispersed front becomes.

70. A leachate plume has been defined in the area of Price's Landfill, although the precise contours of the plume have not been determined. The plume clearly emanates from Price's Landfill and is the result of the chemical dumping that occurred there in 1971 and 1972. There are no other sources of pollution in the area that have significantly contributed to this plume of contaminants.

71. The contaminants in the groundwater have followed and are likely to continue to follow the hydraulic gradient east and east-northeast from the landfill toward the ACMUA wells. The velocity of the leachate from the landfill toward the ACMUA wells will probably range between .70 and .85 feet per day. This rate will vary somewhat with respect to different contaminants. Certain pollutants, such as 1,2 dichloroethane, have a low retardation factor and move more rapidly within the groundwater than other contaminants.

72. The movement of the contaminants toward the ACMUA wells is confirmed by water samples taken from monitoring wells E.P.A. # 1A, located 1,300 feet east of the landfill, and E.P.A. # 6, located 2,000 feet east of the landfill, and private well # 38,

located 2,400 feet east of the landfill. Each of these wells show significant, though diluted, amounts of the contaminant 1,2 dichloroethane. The extent of the leachate plume has not been precisely delineated by the tests done to date. The resistivity test that has been done is of limited utility because of its inability to ascertain the presence of chlorinated hydrocarbons, which are often not conductive and, therefore, difficult to detect using resistivity. Because certain of these chlorinated hydrocarbons, such as 1,2 dichloroethane, move more rapidly than other contaminants, significant pollution can be present well in advance of the time it is detectable using resistivity.

73. The contaminants emanating from the landfill should take approximately 12–15 years from the date of their disposal to reach the ACMUA wellfield, the closest well of which is located 3,400 feet east of the landfill. This calculation, however, does not take into account the effect of the ACMUA wells on the movement of the contaminants.

74. Pumping associated with a large public water supply, such as Atlantic City's, significantly affects the hydraulic gradient in the area around the wells. The pumping of large quantities of water creates cones of depression around the wells, which increase the velocity of groundwater (and pollutants contained in that water) moving toward those wells. The speed of the contaminants will tend to increase dramatically as they approach the pumping wells. The cone of depression created by the pumping ACMUA wells may extend as far west as E.P.A. well # 3, which is 2,500 feet east of the landfill.

75. Between the landfill and the AC-MUA wells, there is no indication of a geologic confining barrier in the upper 100 feet of the Cohansey Aquifer. Thus, there is nothing to impede the flow of contaminants toward those ACMUA wells that draw water from depths less than 100 feet.

76. There is evidence of a clay confining bed under Price's Landfill at a depth of approximately 130 feet (100 feet mean sea level). That clay layer is approximately 40 feet thick. It is possible that this clay layer

extends continuously between the landfill and the ACMUA wells, but this cannot be determined with assurance without further testing. If there is such a continuous clay layer, wells drawing water from the Cohansey Aquifer below that layer would likely not be contaminated by leachate from the landfill.

77. The limited testing that has been done does not reveal any contamination of the groundwaters in the 150–200 foot level of the aquifer.

VII. *The Likely Effect of the Contamination on Water Supplies*

78. Approximately 35 homes are located on the northeast border of the landfill. These homes have been using private wells for their water supply, drawing water from the Cohansey Aquifer at depths generally under 100 feet.

79. Private wells to the east and northeast of the landfill are very likely to encounter strongly contaminated water if they are screened at depths of 40 to 60 feet below the water table and somewhat less polluted water if screened at higher or lower depths.

80. Many of the private wells in this area are presently contaminated by the leachate from the landfill. Individuals who drink water from these wells expose themselves to significantly increased risks of developing toxic conditions, cancer, and birth defects. Other uses of water from these wells, such as bathing, may also lead to health problems, depending on the degree of contamination.

81. The Atlantic City water system is comprised of fifteen wells and a reservoir. Wells # 2, 3, 4, 7, 8, 9, 10, 11, 12, and 13 are operating wells, which draw water from the Cohansey Aquifer. Wells # 14 and 15 draw water from the Kirkwood strata and are screened at a depth of approximately 675 feet. Wells # 1, 5, and 6 are not in service and are presently inoperable.

82. The geohydrological data indicate that the dispersed front of the plume is somewhere beyond monitoring well E.P.A.

# 6, concentrated at a depth of approximately 40 to 70 feet below the water table. The plume is moving in the direction of ACMUA wells # 2, 4, 8, and 13, which draw water from depths of approximately 60 to 100 feet.

83. The average amount of water pumped from the ACMUA wells is between 10 and 11 million gallons per day from September to May and approximately 15 million gallons per day during the summer months. Over 90% of Atlantic City's water needs during 1980 were satisfied from the wells as opposed to the reservoir. This is due to the fact that, in 1979, Atlantic City began to experience difficulties with the surface water provided by the reservoir. The turbidity and color of the surface water made its use less desirable and treatment of the water more expensive. Because this problem persists, the ACMUA has increased the use of well water and decreased its use of the reservoir. Although it is possible for the ACMUA to increase somewhat its use of the surface water in the reservoir, it cannot do so to a significant extent because present treatment facilities are incapable of adequately treating that water. Thus, the surface water must be combined with a significantly greater amount of well water for the composite water to meet Safe Drinking Water Standards. In brief, significantly increased reliance on surface water is not presently a viable option for the ACMUA.

84. Wells # 2, 4, 8, and 13 produced an average of 41% of Atlantic City's daily water consumption during 1979 and 1980. All of these wells are located in the direction that the plume of contaminants from Price's Landfill is flowing and they draw water from depths of under 100 feet. They are, therefore, in imminent danger of serious contamination by the leachate plume emanating from the landfill.

85. Atlantic City has no readily accessible alternate source of supply should these wells become contaminated. Salt water incursion and other problems prevent increased reliance on the other wells in the system. Nor is there presently available an acceptable method to treat the water should it become contaminated.

86. In order to determine the proper strategy to contain the pollution emanating from Price's Landfill, it is essential that a thorough study be done to find, among other things, the extent of the contamination of the Cohansey Aquifer; whether a continuous clay layer exists that will protect the lower stratum of the aquifer from contamination; the precise contours of the pollution plume; and the speed and direction of the plume. Such a study is essential in devising a strategy to contain and mitigate the pollution and to protect the Atlantic City water supply.

87. It may require several years to study the problem adequately and devise and implement an effective plan to remedy the situation. Accordingly, the problem is an imminent one. It is likely that a remedial plan will be quite expensive; indeed, a complete study of the problem will probably involve considerable expenditures. Nonetheless, it is imperative that such a study be done immediately.

## DISCUSSION AND CONCLUSIONS OF LAW

### I. *The Preliminary Injunction Application*

Initially, we consider the Government's application for a preliminary injunction. The Government seeks two forms of preliminary injunctive relief: first, that the defendants be required to fund a study, to be done by the ACMUA, to determine the extent of the problem posed by the leachate from Price's Landfill; and second, that defendants be required to provide an alternate water supply to those private well owners whose wells are presently contaminated. For the reasons indicated below, the preliminary injunction application will be denied.

We recently discussed the standard relevant to a motion for a preliminary injunction:

An application for a preliminary injunction is addressed to the reasoned discretion of the district court. It is generally

accepted that four factors are relevant to the decision whether to issue a preliminary injunction: (1) the probability of irreparable injury to the moving party in the absence of relief; (2) the possibility of harm to the non-moving party if relief is granted; (3) the likelihood of success on the merits; and (4) the public interest. In essence, we must weigh the hardships that are likely to result from the grant or denial of preliminary relief in the light of the movant's likelihood of success on the merits of the litigation.

*Goldhaber v. Foley*, 519 F.Supp. 466, 473 (E.D.Pa.1981) (citations deleted; *see Estate of Elvis Presley v. Russen*, 513 F.Supp. 1339, 1352–53 (D.N.J.1981); 11 C. Wright & A. Miller, Fed.Prac. & Proc. § 2948 (1973). In addition, we note that mandatory preliminary injunctions, such as that sought by the Government here, are particularly disfavored. *See Punnett v. Carter*, 621 F.2d 578 (3rd Cir. 1980); *Anderson v. United States*, 612 F.2d 1112, 1114–15 (9th Cir. 1980).

▮▮▮ The Government argues, however, that where, as here, a statute specifically authorizes injunctive relief, a showing of irreparable harm is unnecessary as Congress has made the determination that statutory violations should be enjoined. There is some weight to that argument. *See, e. g., United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3rd Cir. 1976); *cf. Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902 (3rd Cir. 1981). Nonetheless, we do not believe that the traditional equitable discretion of the court is entirely irrelevant whenever a statute specifically provides for injunctive relief. *See Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Spectro Foods Corp., supra*, 544 F.2d at 1181. A showing of irreparable injury is, perhaps, unnecessary to enjoin the commission of a specific statutory violation, when the statute explicitly provides for injunctive relief;

however, that is simply not the case here. The Government seeks a mandatory injunction that is designed essentially to remedy the ill effects of past actions, not to restrain ongoing statutory violations. Under these circumstances, the fact that the RCRA and the SDWA authorize injunctive remedies is insufficient to rid us of the obligation to determine whether such relief is appropriate, a decision that necessarily involves consideration of traditional equitable criteria. *Id. See United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3rd Cir.), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1974); *United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138, 144 (N.D.Ind.1980). Of course, in making our determination we shall accord due deference to the public policy considerations expressed in the applicable statutes.

▮▮▮ As noted above, the Government seeks two forms of preliminary relief. First, it asks that we order the defendants to fund a study to monitor the extent of the problem posed by the leachate emanating from the landfill and to devise a solution to the problem. We entirely agree that a thorough study of the problem is essential and should be done immediately. Nonetheless, an order compelling defendants to fund such a study would not be an appropriate form of preliminary injunctive relief. As the Third Circuit has recently commented, "[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States*, 592 F.2d 712, 715 (3rd Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974); *Monahan v. Nebraska*, 491 F.Supp. 1074, 1075, 1093–94 (D.Neb. 1980). This fundamental principle forecloses the first form of relief the Government seeks.[2]

---

2. We note that section 17(a) of the 1980 amendments to RCRA, 42 U.S.C. § 6934(d), specifically authorizes the E.P.A. Administrator to have a State or local authority or other person conduct monitoring, analysis, and testing of a site "at which hazardous waste is, or has been, stored, treated, or disposed of," and to require the owner or operator of the site to reimburse the authority or person for the costs of that study. Nothing in this opinion should

Indeed, to a considerable extent, *Jaffee* casts doubt on the appropriateness of the second form of preliminary relief that is sought, an order compelling the provision of an alternate water supply to those home-owners whose wells are now contaminated by the leachate. Defendants are no more able than the homeowners or than plaintiff to provide an alternate water supply. The crux of the issue is simply who will bear the expense that is involved. Thus, just as was true with respect to the request for the provision of medical services that was at issue in *Jaffee*, this is not a matter appropriate for preliminary injunctive relief.

Nonetheless, we note that the legislative history of the SDWA explicitly indicates that the Administrator is empowered to order (and presumably to seek an injunction which orders) responsible parties "to pro-vide alternative safe water supply sources in the event any drinking water source which is relied upon becomes hazardous or unuseable." H.R.Rep. No. 1185, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 6454, 6487. Thus, we note two additional reasons to deny the preliminary injunction motion. First, the statute spe-cifically indicates that the Administrator may commence "a civil action for *appropri-ate relief*, including a restraining order or permanent or temporary injunction. 42 U.S.C. § 300i(a) (emphasis added). This language reveals that Congress did not in-tend the types of relief discussed in the legislative history to be afforded on a *pro forma* basis, but only where such relief was appropriate. Certainly, we can conceive of situations in which requiring the provision of alternate water supplies would be appro-priate relief. However, as noted above, in the instant case the issue is simply who will bear the cost of the alternate water supply. This is not a matter appropriate for resolu-tion on an application for a preliminary injunction. Secondly, insofar as the Government seeks relief on behalf of the private well-owners, it has not demonstrat-ed probable success on the merits of its

SDWA claim. The statute, including the imminent hazard provision, applies only to "public water systems," defined as water systems which have at least 15 service con-nections or which regularly serve at least 25 individuals. 42 U.S.C. § 300f(4). Thus, the statute does not apply to private wells, and the relief sought on behalf of the private well-owners is not mandated or even appro-priate under that Act.

■ For the reasons indicated above, the Government's application for a preliminary injunction will be denied. Of course, we in no way decide the appropriateness of any form of final injunctive relief that may be sought after a full hearing on the merits.

II.  *The Summary Judgment Motions*

Also being considered by the court are defendants' summary judgment motions. The standard for summary judgment is, of course, a stringent one. Summary judg-ment may only be granted "when the plead-ings, depositions, answers to interrogato-ries, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-ment as a matter of law." Fed.R.Civ.P. 56(c). Moreover,

> When considering a summary judgment motion, "[i]nferences to be drawn from the underlying facts contained in the evi-dential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the mo-tion. The non-movant's allegations must be taken as true and, when these asser-tions conflict with those of the movant, the former must receive the benefit of the doubt."

*Special Jet Services, Inc. v. Federal Ins. Co.,* 643 F.2d 977, 980 (3rd Cir. 1981), *quoting Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In brief, summary judgment is not

---

be interpreted to preclude the Administrator from seeking to recover the costs of testing

pursuant to section 17(a).

designed to provide an easy method for the resolution of factual issues; rather, it is a mechanism to allow the efficient resolution of cases in which there are no genuine issues of fact. *See Manetas v. International Petroleum ·Carriers, Inc.*, 541 F.2d 408 (3rd Cir. 1976).

Defendants raise a number of arguments in support of their summary judgment motions. First, they argue that the Government has no cause of action, given the instant facts, under the federal common law of nuisance. Second, they argue that, because they are not presently dumping chemicals at the landfill, they are not liable under either the RCRA or the SDWA. Third, they contend that those statutes should not be applied retroactively to impose liability for acts they performed several years before the statutes became effective. Finally, each of the defendants argues, albeit for somewhat different reasons, that he is not a proper defendant in an action brought under those statutes. We shall consider these arguments in the context of the claims for relief to which they relate.

## A. The Federal Common Law of Nuisance Claim

Initially, defendants contend that the Government has no cause of action against them under the federal common law of nuisance. We agree.

■ The type of claim raised here is simply outside the bounds of the federal courts' law making authority. It is well established that the federal courts do not have the authority to make law that is inherent in state common law courts. *City of Milwaukee v. Illinois and Michigan*, — U.S. —, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981). *See Texas Inds., Inc. v. Radcliff Materials*, — U.S. —, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973). The scope of the federal courts' law making authority is much more limited than the area in which Congress may legitimately legislate; *see Texas Inds., supra;*

indeed, the former is limited to situations "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 92 S.Ct. 1385, 1393 n.6, 31 L.Ed.2d 712 (1972). It is uncontested that the pollution at issue here, unlike that at issue in *Illinois*, is intrastate in all relevant respects. Coping with such intrastate pollution neither requires a uniform federal rule of decision nor implicates important federalism concerns. *See* 42 U.S.C. §§ 6901(a)(4); 6941; *but see United States v. Solvents Recovery Serv. of New Eng.*, 496 F.Supp. 1127, 1135–38 (D.Conn. 1980). In brief, this is not a proper area for the development of federal common law.

■ In addition, even if this were an appropriate area for federal common law, any such common law has been preempted by the enactment of the RCRA and, more recently, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* In determining whether a federal statute has preempted federal common law, we start with the understanding that "it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *City of Milwaukee, supra*, 101 S.Ct. at 1792. The comprehensive nature of the schemes established by the RCRA and the CERCLA require us to conclude that, if federal common law ever governed this type of activity, it has since been preempted by those statutes. *See Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n*, — U.S. —, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981). Therefore, defendants' summary judgment motions will be granted insofar as the Government's federal common law claims are concerned.

## B. The RCRA Claim

The Government brings this action under the imminent hazard section of the RCRA, which provides as follows:

Notwithstanding any other provision of this chapter, upon receipt of evidence

that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to such handling, storage, treatment, transportation or disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit. The Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

42 U.S.C. § 6973(a).[3] Section 7003 is but one of several imminent hazard provisions that Congress has included in environmental statutes. *See, e. g.*, 42 U.S.C. §§ 300i(a); 7603(a). These provisions are broadly drafted to give appropriate Government officials the right to seek judicial relief or take other appropriate action to avert imminent and substantial threats to the environment or public health.

Defendants raise three related but distinct arguments with respect to the Government's section 7003 claim. First, they argue that the statute is purely prospective and does not apply to disposal sites, such as Price's Landfill, that are no longer in active operation. Second, they contend that the statute, which became effective in 1976, should not be applied retroactively to impose liability for acts they performed in 1971 and 1972. Third, defendants argue

that they are not persons "contributing to" the handling or disposal of hazardous wastes and, therefore, that they are not liable under the statute. In support of their arguments, defendants note the uncontested facts that chemical dumping at the landfill ceased in November of 1972 and that all dumping ceased in 1976. The A.G.A. defendants note the additional facts that they were never actively involved in the dumping that occurred at the landfill and that they never knew of the chemical wastes that had been dumped there until 1979. Nonetheless, for the reasons indicated below, we conclude that defendants are not entitled to summary judgment with respect to the Government's RCRA claim.

■ Defendants' first argument is that section 7003 is purely prospective, designed to prevent future dumping in certain circumstances but not to remedy the effects of past waste disposal practices. There is some merit to this argument, but we do not see it as a sufficient basis for granting summary judgment. Two basic principles of statutory construction guide our analysis of section 7003: first, that we should look first and foremost to the plain language of the statute, which "controls when sufficiently clear in its context." *United States v. Bush*, 647 F.2d 357, 368 (3rd Cir. 1981); and second, that we should pay close attention to the manner and context in which that language is being used. *Id.* A straightforward reading of section 7003, which is quoted above, reveals that it is not a general clean up provision and that its thrust is basically prospective. The statute is, we note, written in the present tense, and Congress employed words, such as "stop" and "restrain," that clearly denote a prospective orientation. Hence, we agree

---

**3.** Defendants argue that the RCRA should only apply to cases of interstate pollution. That argument is utterly without merit. Section 7003 neither states nor implies that it is applicable only when hazardous wastes have crossed state lines. Indeed, the section specifically refers to the "affected State," in which respect it is in keeping with the other provisions of the statute. Moreover, the legislative history of the RCRA specifically refers to Price's Landfill as an example of the type of

situation the Act was intended to deal with. *See* H.R.Rep. 1491-Part I, 94th Cong., 2d Sess. 18, *reprinted in* [1976] U.S.Code Cong. & Ad. News 6238, 6256. Thus, we conclude that the statute was intended to apply to hazardous waste facilities ensconced in the middle of a state as well as to those perched on a border. Nor can it seriously be contended that, in this respect, Congress exceeded its constitutional authority.

with defendants that section 7003 was essentially intended to allow the Administrator to prevent future harm, not cure past ills. *But cf. Solvents Recovery Serv. of New Eng., supra,* 496 F.Supp. at 1139–41. That does not lead, however, to the conclusion that summary judgment is warranted.

The Government correctly observes that RCRA's definition of "disposal," one of the activities within the ambit of section 7003, is quite broad. Section 2 of RCRA defines disposal as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). Not only is this definition quite broad but, significantly, it includes within its purview leaking, which ordinarily occurs not through affirmative action but as a result of inaction or negligent past actions. In addition, the statute broadly authorizes the Administrator to bring suit to enjoin "such other action as may be necessary." [4] The Government therefore argues that it is entitled to relief under section 7003, notwithstanding the fact that the active disposal of wastes at the landfill ceased over five years ago.

We conclude that the statute does not authorize a general clean up of dormant waste disposal sites, but that the Government may rely upon it to prevent further harm to the environment. By its plain language, the statute authorizes relief restraining further disposal, *i. e., leaking,* of hazardous wastes from the landfill into the groundwaters. *See United States v. Vertrac Chem. Corp.,* 489 F.Supp. 870, 885 (E.D. Ark.1980); *Midwest Solvent Recovery, Inc., supra,* 484 F.Supp. at 144–45; H.R.Rep. No. 1016, Part II, 96th Cong., 2d Sess. 4, *reprinted in* [1981] U.S.Code Cong. & Ad. News 10281, 10283. That disposal need not

result from affirmative action by the defendants but may be the result of passive inaction. In brief, section 7003 does not mandate the clean up of the ten years of leachate contamination that has emanated from the landfill. It does, however, authorize Government suits to restrain the continued leaking of wastes in a manner that may present an imminent hazard to the environment or to health. *See* 43 Fed.Reg. 58,945, 58,984 (1978); Note, *Allocating the Costs of Hazardous Waste Disposal,* 94 Harv.L.Rev. 584, 596 (1981). Thus, although the relief available to the Government under section 7003 will be somewhat limited, defendants are not entitled to summary judgment with respect to that claim.

Defendants' second argument is closely related. They observe that section 7003 was not adopted and did not become effective until 1976, and they argue that the statute was not meant to apply retroactively to acts that preceded that date. Hence, because the dumping of toxic wastes at Price's Landfill ceased in 1972, defendants argue that the statute cannot be used to impose liability on them.

We find this argument unpersuasive for reasons that are, to a significant extent, implicit in our earlier discussion. The gravamen of a section 7003 action, as we have construed it, is not defendants' dumping practices, which admittedly ceased with respect to toxic wastes in 1972, but the present imminent hazard posed by the continuing disposal (*i. e.,* leaking) of contaminants into the groundwater. Thus, the statute neither punishes past wrongdoing nor imposes liability for injuries inflicted by past acts. Rather, as defendants themselves argue, its orientation is essentially prospective. When construed in this manner, the statute simply is not retroactive. It merely relates to current and future conditions.

---

**4.** Although this phrase can be read as authorizing the Administrator to take "such other action as may be necessary," such a reading renders the final sentence of section 7003 meaningless. We therefore interpret the "such other action" clause as referring to the type of judicial relief that the Agency may pursue. This reading accords with the broad grant of remedial authority that one would expect to find in an imminent hazard provision.

Admittedly, from a practical perspective, defendants may be compelled under our reading of the statute to remedy the continuing effects of acts they performed prior to the statute's adoption. *See Zee v. Li Pari,* (D.N.J.1981). But we do not conceive of this as contrary to the purposes of the RCRA, one of the objectives of which was to require the "conversion of existing open dumps to facilities which do not pose a danger to the environment or to health." 42 U.S.C. § 6902(3); *see also* 42 U.S.C. §§ 6933(d), 6934; *Solvents Recovery Serv. of New Eng., supra,* 496 F.Supp. at 1140–42. Indeed, Congress has subsequently confirmed that it intended section 7003 to apply to " 'events which took place at some time in the past but which continue to present a threat to the public health or the environment.' "[5] Nor can it seriously be questioned that Congress has the authority to require the clean up of waste disposal sites that are currently presenting a hazard to the environment or to health. Because the gravamen of a section 7003 action is the current existence of a hazardous condition, not the past commission of any acts, we see no retroactivity problem with the statute.

◼◼ Defendants' third argument is that they are not persons within the ambit of liability defined by the statute. They note that section 7003 authorizes relief from "any person contributing to" the disposal of hazardous wastes, and they argue that they are not contributing to any such disposal. The peculiar difficulty presented by this case is that the property was sold in 1979 by the persons who had previously operated the landfill to several persons who had no previous connection with the landfill or the waste disposal operation. Therefore, in analyzing this third argument, we must take into account the somewhat distinct positions of the Price defendants and the A.G.A. defendants.

The Price defendants operated the landfill from 1969 through 1976 and eventually

sold the property in 1979. They argue that they are not now contributing to the disposal of wastes and that they are therefore not liable under the act. Their reading of the statute, however, is too confined. We have earlier noted the extremely broad statutory definition of disposal to encompass the passive leaking of contaminants from the landfill. It is evident that the current leaking of contaminants from the landfill is being contributed to in large measure by the failure of the Price defendants to store properly the chemical wastes. Certainly, that proper storage should have been done in 1971 and 1972, when the wastes were originally deposited in the landfill. But it cannot be denied that their continued failure to rectify the hazardous condition they created has been and is contributing to the leaking that is now occurring.

Thus, the critical question with respect to the Price defendants is whether their statutory duty to prevent the disposal of contaminants from the landfill ended when they sold the property in 1979. We conclude that their sale of the property did not relieve them of their accountability under the statute. We reach this conclusion, in large part, because the actions and inaction of the Price defendants are the primary cause of the hazardous situation that now exists. Although the current owners of the property may well also have a duty to prevent the continued disposal of contaminants from the landfill, it would be inequitable to require them to bear the entire burden of a situation that was largely caused by others. *See Vertrac Chem. Corp., supra,* 489 F.Supp. at 877. More importantly, society's interests in deterring the improper disposal of hazardous wastes and in alleviating serious hazards as quickly as possible mandate that those responsible for the disposal of such wastes not be able to shirk their statutory responsibilities by simply selling the property on which the wastes are stored.

Our conclusion that the Prices are proper defendants, notwithstanding their sale of

---

5. *Id.* at 1140, quoting Report on Hazardous Waste Disposal by the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce, 96th Cong., 1st Sess. 31–32 (1979). See also H.R. Rep. No. 1016, Part II, 96th Cong., 2d Sess. 4, *reprinted in* [1981] U.S.Code Cong. & Ad.News 10249, 10255, 10283.

the property, is supported, albeit indirectly, by the limited legislative history that is available. In adopting certain amendments to the statute, the Senate recently commented:

> [S]ection 7003 should not be construed solely with respect to the common law. Some terms and concepts, such as persons "contributing to" disposal resulting in a substantial endangerment, are meant to be more liberal than their common law counterparts. For example, a company that *generated* hazardous waste might be someone *"contributing to"* an endangerment under section 7003 even where someone *"contributing to"* an endanger-improper disposal site . . . where the generator *had* knowledge of the illicit disposal or *failed* to exercise due care in selecting or instructing the entity actually conducting the disposal.

S.Rep.No.172, 96th Cong., 2d Sess. 5, *reprinted in* [1980] U.S.Code Cong. & Ad. News 8665, 8669 (emphasis added). This legislative history reveals two noteworthy points: first, that Congress intended the phrase "contributing to" disposal to be interpreted in a liberal, not a restrictive, fashion; and second, that Congress realized that past acts could presently be contributing to an endangerment and intended those acts to be within the ambit of the statute. Certainly, the Price defendants' improper methods of storing the chemical wastes are presently contributing to the leaking of chemical contaminants into the Cohansey Aquifer no less than the actions of the generators of those wastes who may have failed to exercise due care in their choice of a landfill. They are proper defendants notwithstanding their sale of the property, and their summary judgment motion will be denied insofar as the section 7003 claim is concerned.[6]

In some respects, a more troubling question is presented with regard to the liability of the A.G.A. defendants. They bought the property several years after all dumping had ceased and therefore argue that they never have and are not now "contributing to" the disposal of any hazardous wastes. This argument, however, is predicated on the same erroneous premise as that underlying the Price defendants' contentions—the idea that "disposal" requires some active behavior. That is simply not so. As owners of the property, the A.G.A. defendants are, we conclude contributing to the disposal (*i. e.,* leaking) of wastes merely by virtue of their studied indifference to the hazardous condition that now exists. The idea that ownership imposes responsibility for hazardous conditions on one's land is certainly not novel. *See Vertrac Chem. Corp., supra,* 489 F.Supp. at 877. Admittedly, the A.G.A. defendants did not create that hazardous condition. Nonetheless, they were aware, at the time they purchased the property, that it had been used as a landfill. As sophisticated investors, they had a duty to investigate the actual conditions that existed on the property or take it as it was. They deliberately chose the latter course. Moreover, they became aware in the summer of 1979 that toxic chemicals had been dumped at the landfill, but they have done nothing to abate the hazardous condition that exists. Under these circumstances, the A.G.A. defendants may be held responsible to stop the continued leaking of contaminants from the site.

The liability of the A.G.A. defendants under section 7003 is supported by the legis-

---

**6.** Virginia Price and Carl Price raise the additional argument that they were not responsible for the disposal of toxic wastes at the landfill. Mrs. Price asserts that she was merely a co-owner of the property and never actively involved in the waste disposal operation; Carl Price asserts that he was merely his brother's employee and therefore should not be held liable. We disagree. There are, at the least, factual questions with respect to the responsibility of these defendants. Mrs. Price was a co-owner of the property and, as such, she had a duty to prevent the improper use of the landfill even though she was not actively involved in its operation. Carl Price, on the other hand, managed the landfill and was very actively involved in its operation. Although he did not possess an ownership interest in the property or the business, he was certainly more than a "mere employee." These defendants clearly fall within the broad ambit of "any person contributing to" a disposal of hazardous wastes. Therefore, their summary judgment motions will also be denied.

lative history of the Act, by other provisions of the statute, and by an administrative interpretation of the section. The legislative history of the 1980 amendments to the statute, quoted above, reveals that Congress intended the "contributing to" disposal language to be interpreted broadly. Indeed, the Senate Report specifically includes generators of wastes within its ambit "where the generator had knowledge of the illicit disposal or failed to exercise due care in selecting . . . the entity actually conducting the disposal." [1980] U.S.Code Cong. & Ad. News 8665 at 8669. We see no reason not to hold subsequent owners of a landfill to a comparable standard. This approach is confirmed by another provision of the statute, which specifically holds subsequent owners liable unless they "could not reasonably be expected to have actual knowledge of the presence of hazardous waste at such facility or site and of its potential for release." 42 U.S.C. § 6934(b). Further, our reading of the statute is in accord with the E.P.A.'s interpretation of section 7003's reach. *See* 43 Fed.Reg. 58,945, 58,984.

The A.G.A. defendants could well argue that the specific reference to subsequent owners in other sections of the statute indicates that such persons were not intended to be accountable under section 7003. Such an argument might be persuasive if we believed that the "contributing to" disposal language used by Congress was intended to restrict the class of persons accountable under that section. But the opposite is the case. Congress used that language in an attempt to liberalize, not restrict, the class of persons liable under the imminent hazard provision. Accordingly, the summary judgment motion of the A.G.A. defendants will be denied insofar as the Government's RCRA claim is concerned.

## C. *The SDWA Claim*

The Government also seeks relief pursuant to the imminent hazard provision of the SDWA, section 1431, which provides as follows:

Notwithstanding any other provision of this subchapter, the Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such system (including travelers), and (2) commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction.

42 U.S.C. § 300i(a). An extended discussion of the requirements of this statute is unnecessary at this time. What is immediately apparent, however, is that in several respects the section is more broadly drawn than the comparable provision of the RCRA. The legislative history of section 1431 confirms that its broad reach was purposeful: "Section 1431 reflects the Committee's determination to confer completely adequate authority to deal promptly and effectively with emergency situations which jeopardize the health of persons." H.R.Rep. No. 1185, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 6454, 6487.

Defendants raise identical objections to the section 1431 claim as they did to the Government's section 7003 claim. Largely for the reasons discussed above, we will deny defendants' summary judgment motions with respect to the section 1431 claim. In addition, we note that section 1431 does not have the language that led us to conclude that section 7003 was intended

only to prevent the future disposal of contaminants into the environment. Although section 1431 is prospective in the sense that its concern is alleviating present imminent hazards, the legislative history of the statute reveals that Congress intended to authorize broad forms of affirmative relief, including the treatment or reduction of hazardous situations and the provision of alternate water supplies, where appropriate. Although we need not and do not decide at this time what forms of relief are appropriate under this statute, it may well be that the relief available under section 1431 is broader than that available under section 7003 of the RCRA.

■■■ The gravamen of a section 1431 action is the present existence of an imminent hazard. Defendants' retroactivity argument is as unsound here as it was in the context of the RCRA claim. In addition, we note that the legislative history of section 1431 indicates that the Administrator may seek appropriate relief from State and local officials, area or point source polluters, or "*any other person whose action or inaction* requires prompt regulation to protect public health." *Id.* (emphasis added). It is even clearer under section 1431 than under section 7003 that both the Price defendants and the A.G.A. defendants are liable for appropriate relief.[7]

### III. *Rule 19 Motion*

■■■ Defendants have moved, pursuant to Rule 19, Fed.R.Civ.P., to compel the joinder of the chemical companies that generated the wastes deposited in the landfill and the transporters that hauled those wastes. They also seek the joinder of the New Jersey Department of Environmental Protection. We agree with defendants that equitable considerations support the addition of the generators and transporters as defendants. Nonetheless, we must deny

their Rule 19 motion. The traditional rule is that one tortfeasor may not compel the joinder of other alleged joint tortfeasors. 7 Wright & Miller, *supra*, at § 1623. Rule 19 did not depart from that long-established principle. Advisory Committee's Note to Rule 19, 39 F.R.D. 89, 91 (1966); *see American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1244–45 n.42 (3rd Cir. 1975); *Herpich v. Wallace*, 430 F.2d 792, 817 (5th Cir. 1970). Therefore, defendants' Rule 19 motion will be denied. Of course, we take no position at this time with respect to whether defendants have a right to contribution against the generators and transporters under New Jersey or federal law.[8]

### IV. *Conclusion*

The miraculous achievements of modern technology have led to many advances in our standard of living and our way of life. Among the by-products of modern technology, however, are materials that pose a grave threat to the environment and, indeed, to our continued existence. For many years we have done our best to ignore this fact. It is, after all, simply human to avoid problems, rather than deal with them, whenever we can. The instant situation is the direct result of such an atavistic approach to the problems posed by modern technology. The lesson to be learned from this situation and others like it is a simple one: if we brush our problems under the carpet or bury them under the earth, they are not solved; we only postpone dealing with them. We hope that this case and similar ones will teach all concerned that short-term solutions to the problem of hazardous waste disposal are no longer a viable approach, nor do they remedy the problems posed by past thoughtlessness.

### ORDER ON PRELIMINARY INJUNCTION and SUMMARY JUDGMENT

This matter having been brought before the court on the 12th day of June, 1981; and

---

7. We find that the Administrator has adequately complied with the statutory requirement that he act only when State action has not been forthcoming or effective. *See* Findings of Fact 20–24. Defendants' argument to the contrary is without merit.

8. Shortly before the filing of this opinion, plaintiff filed on September 21, 1981 a Second Amended Complaint adding additional defendants, designating them as haulers and generators.

The court having considered the testimony, affidavits, briefs, and oral argument of counsel; and

For the reasons stated in the court's opinion filed this date,

It is on this 23rd day of September, 1981, hereby ORDERED:

1. Plaintiff's motion for a preliminary injunction is denied.

2. Defendants' motions for summary judgment are denied, except with respect to plaintiff's cause of action based on the federal common law of nuisance, which is dismissed with prejudice.

3. Defendants' motions to compel the joinder of additional parties, pursuant to Rule 19, Fed.R.Civ.P., are denied.

4. Plaintiff's motion to strike paragraphs 27–37 of the A.G.A. defendants' answer to the First Amended Complaint is denied.

No costs.